Michael G. BURTON, as Executive Director and on Behalf of the REPUBLICAN PARTY, et al., Plaintiffs,

Kimberly T. Burch, Plaintiff–Intervenor,

v.

Robert J. SHEHEEN, in his representative capacity as Speaker of the South Carolina House of Representatives, et al., Defendants,

Robin Tallon, Neil A. Vander Linden, Forrest E. Ott, Philip T. Jones, Ann Y. Hart, Peggy A. Dufek, Gwendolyn L. Grooms, the South Carolina Senate, the Democratic Party of South Carolina, Defendants–Intervenors.

Katharine I. Butler, Amicus Curiae.

STATEWIDE REAPPORTIONMENT ADVISORY COMMITTEE, et al., Plaintiffs,

v.

Carroll A. CAMPBELL, Jr., et al., Defendants.

Katharine I. Butler, Amicus Curiae.

Bufort BLANTON, Neil A. Vander Linden, Forrest E. Ott, Ann Y. Hart, Peggy A. Dufek and Vincent Johnson, Plaintiffs,

v.

Carroll A. CAMPBELL, Jr., et al., Defendants.

Civ. A. Nos. 3:91–2983–1, 3:91–3310–1 and 3:91–3635–1.

United States District Court, D. South Carolina, Columbia Division.

May 1, 1992.

---

Thomas R. Gottshall, Steve Allen Matthews, Sinkler And Boyd, Columbia, S.C., for plaintiffs.

Laughlin McDonald, American Civil Liberties Union, Atlanta, Ga., Willie Abrams, Dennis Courtland Hayes, NAACP, Baltimore, Md., John Roy Harper, II, Columbia, S.C., for Statewide Reapportionment Advisory Committee.

Edwin E. Evans, Columbia, S.C., Robert Erving Stepp, Terrell Lyles Glenn, Sr., Elizabeth Howard Simmons, Blaney A. Coskrey, III, Glenn, Irvin, Murphy, Gray & Stepp, John C. Moylan, III, Lieutenant Governor's Office, Columbia, S.C., for defendants Robert J. Sheheen and Nick Theodore.

Frederick Aubrey Crawford, Columbia, S.C., Robert N. Hunter, Jr., Patton, Boggs & Blow, Greensboro, N.C., Clyde Havird Jones, Jr., Joseph Dawson Shine, Columbia, S.C., for defendants Carroll A. Campbell, Jr. and James B. Ellisor.

Katharine I. Butler, pro se.

Vinton Devane Lide, Michael Hart Montgomery, Lide, Montgomery & Potts, P.C., for defendant-intervenor Robin Tallon.

Hans F. Paul, North Charleston, S.C., Gedney M. Howe, III, Charleston, S.C., Wallace K. Lightsey, Frank S. Holleman, III, Wyche, Burgess, Freeman & Parham, P.A., Greenville, S.C., for defendants-intervenors.

Roger E. Henderson, Leppard, Henderson & Spencer, Chesterfield, S.C., for plaintiff-intervenor Kimberly T. Burch.

Before HAMILTON, Circuit Judge, HAWKINS, Chief District Judge, and ANDERSON, District Judge.

## ORDER

In these consolidated cases, the court is called upon to either adopt or create plans for the redistricting[1] of South Carolina's Senate, House of Representatives, and Congressional districts. Following tabulation of the 1990 decennial census, it was apparent the existing Senate, House, and Congressional plans could not be continued.[2] Although the South Carolina General Assembly passed new Senate and House plans, those plans were vetoed by the Governor, the vetoes were sustained, and no compromise was reached. The General Assembly never passed a Congressional plan. These suits were filed in an effort to break the legislative impasse.

## I

### BACKGROUND

This court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), and 2201; this suit being authorized under 42 U.S.C. § 1973j(f) through 42 U.S.C. § 1973c. The three-judge panel was appointed pursuant to 28 U.S.C. § 2284(a).[3]

The South Carolina General Assembly (General Assembly) consists of two bodies:[4] a Senate with forty-six (46) seats[5]

---

**1.** In its technical sense "reapportionment" refers to the redistribution of seats in established units of government such as the United States House of Representatives. "Redistricting" signifies line-drawing to establish new districts within these units. *Kilgarlin v. Martin,* 252 F.Supp. 404, 410 n. 1 (S.D.Tex 1966) *rev'd in part and remanded sub nom. Kilgarlin v. Hill,* 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967). *See* Bickerstaff, *Reapportionment by State Legislatures: A Guide for the 1980's,* 34 Sw.L.J. 607, 608 (1980).

**2.** At trial, all parties stipulated the existing plans were unconstitutionally apportioned because of gross population disparities among the districts in the respective plans. *See Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *See also, infra,* note 13 and pages 1342–45. Because the existing districts violate constitutional norms, we need not reach the question of whether or not the existing districts also violate § 2 of the Voting Rights Act as amended in 1982. 42 U.S.C. § 1973.

**3.** 28 U.S.C. § 2284(a) provides:

A district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide body.

On October 23, 1991, Chief United States Circuit Judge Sam J. Ervin, III, of the Fourth Circuit Court of Appeals issued an order appointing United States Circuit Judge Clyde H. Hamilton, of the Fourth Circuit Court of Appeals, Chief United States District Judge Falcon B. Hawkins, of the District of South Carolina, and United States District Judge G. Ross Anderson, Jr., of the District of South Carolina to the panel.

**4.** S.C. Const. Art. III, § 1.

**5.** S.C. Const. Art. III, § 6; S.C.Const. Art. VIII, § 3; S.C.Code Ann. §§ 4–3–10 through 4–3–530 (1976). The forty-six counties in South Carolina are: Abbeville, Aiken, Allendale, Anderson, Bamberg, Barnwell, Beaufort, Berkeley, Calhoun, Charleston, Cherokee, Chester, Chesterfield, Clarendon, Colleton, Darlington, Dillon,

and a House of Representatives with 124 seats.[6] Senators are elected to serve four-year terms,[7] while House members are elected to serve two-year terms.[8] According to the Office of the Clerk of the United States House of Representatives, South Carolina is entitled to six Congressional representatives.

█ It is primarily the responsibility of the General Assembly, subject to the approval of the Governor, to redistrict or reapportion the Senate, House, and Congressional districts. Redistricting is primarily a matter for legislative consideration and determination and judicial relief becomes appropriate only when a legislature fails to redistrict according to federal constitutional and statutory requisites in a timely fashion after having had an opportunity to do so. *White v. Weiser,* 412 U.S. 783, 794–95, 93 S.Ct. 2348, 2354–55, 37 L.Ed.2d 335 (1973) (quoting *Reynolds v. Sims,* 377 U.S. 533, 586, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506 (1964)); U.S. Const. Art. I, § 2; 2 U.S.C. § 2c; S.C. Const. Art. III, § 3. We do not tread unreservedly into this "political thicket";[9] rather, we proceed in the knowledge that judicial intervention in the instant case is wholly unavoidable. In fact, judicial intervention in the South Carolina redistricting process has been frequently unavoidable. In 1984, the General Assembly ultimately fulfilled its constitutional obligation and passed a Senate redistricting plan only after a three-judge panel put an interim plan in place. *Graham v. South Carolina,* Civil Action No. 3:84–1430–15 (D.S.C. July 31, 1984).[10] South Carolina's Congressional districts were last drawn in March of 1982 by a three-judge panel. The General Assembly never passed its own plan; therefore, the court's plan became the state's plan. *S.C. State Conference of Branches of the N.A.A.C.P. v. Riley,* 533 F.Supp. 1178 (D.S.C. 1982). The House of Representatives was last redistricted in 1981 without judicial intervention.[11] This plan was precleared by the Department of Justice and has been used continuously since.[12]

The results of the 1990 census, issued in March 1991, showed South Carolina's population increased from 3,121,820 to 3,486,703 between 1980 and 1990. In addition to this increase, there were significant shifts in population, primarily from urban and rural areas to suburban and resort areas. Although there was, of course, no way the General Assembly could have foretold the actual results of the 1990 census, it can hardly be argued that the overarching result of the census—unconstitutional apportionment—was a surprise.[13] Both the Senate and the House had sophisticated computer software and highly trained operators in place when the census figures were released. In addition, both branches were politically prepared, to the extent subcommittees were appointed, to study issues exclusively related to redistricting and ulti-

---

Dorchester, Edgefield, Fairfield, Florence, Georgetown, Greenville, Greenwood, Hampton, Horry, Jasper, Kershaw, Lancaster, Laurens, Lee, Lexington, Marion, Marlboro, McCormick, Newberry, Oconee, Orangeburg, Pickens, Richland, Saluda, Spartanburg, Sumter, Union, Williamsburg, and York Counties.

6. S.C. Const. Art. III, § 3.

7. S.C. Const. Art. III, § 6.

8. S.C. Const. Art. III, § 2.

9. *Colegrove v. Green,* 328 U.S. 549, 556, 66 S.Ct. 1198, 1201, 90 L.Ed. 1432 (1946).

10. *See O'Shields v. McNair,* 254 F.Supp. 708 (D.S.C.1966) (three-judge court approved General Assembly plan for the Senate solely as an interim plan despite "grave doubts as to [its] validity under both state and federal constitu-

tions" and approved the General Assembly's plan for the House of Representatives); *McCollum v. West,* Civil Action No. 71–1211 (D.S.C. filed 12/7/71) (the Court struck down the General Assembly's plan for the reapportionment of the Senate).

11. "In respect to the reapportionment of the House of Representatives, South Carolina's General Assembly is one of those which has faithfully complied with its constitutional obligations." *O'Shields,* 254 F.Supp. at 717.

12. South Carolina is a covered jurisdiction under the Voting Rights Act. 42 U.S.C. § 1973c.

13. Using the 1990 census figures, the present Senate plan has a total deviation of 63.15 percent, the present House plan a total deviation of 113.86 percent, and the present Congressional plan a total deviation of 8.33 percent.

mately to fashion plans on behalf· of their respective bodies.

Despite this preparation, the General Assembly was unable to pass a redistricting bill before the 1990–91 Legislative Session adjourned.[14] The Senate had passed a redistricting plan for itself (S. 1003) as did the House (H. 3834), but neither body was able to consider the plan passed by the other before adjournment *sine die.* A concurrent resolution was introduced to extend the session, but it did not receive the two-thirds majority vote required by S.C.Code Ann. § 2–1–180 (1976). The Governor could have effectively extended the session by ordering a special session, S.C. Const. Art. IV, § 19, but he did not exercise this authority.

On October 4, 1991, Michael G. Burton, on behalf of the Republican Party and other registered voters of the state, filed suit (the *"Burton"* case)[15] against the Speaker of the House, the Lt. Governor, the Governor, and the Executive Director of the Election Commission[16] alleging the present Senate, House, and Congressional plans were unconstitutional based on changes in population and that the plans violated 42 U.S.C. 1973c. The plaintiffs also alleged legislative impasse.

As a remedy for their claims, the plaintiffs requested that this court enjoin any future use of the existing plans and either approve the plans submitted by the plaintiffs or create new Senate, House, and Congressional plans which comport with federal constitutional and statutory requisites. In conjunction with the filing of their complaint, the plaintiffs requested a three-judge court be empaneled pursuant to 28 U.S.C. § 2284(a).

On October 23, 1991, Congressman Robin A. Tallon moved to intervene as a plaintiff and on October 28, 1991, Neil A. Vander Linden, Forrest E. Ott, Philip T. Jones, Ann Y. Hart, Peggy A. Dufek, and Gwendolyn L. Grooms (the "Vander Linden" defendants) moved to intervene as defendants. On October 31, 1991, the South Carolina Senate also moved to intervene as a defendant. These motions were granted by order on November 13, 1991 under the authority of Fed.R.Civ.P. 24 and *Newport News Shipbuilding and Drydock Co. v. Peninsula Shipbuilder's Ass'n,* 646 F.2d 117 (4th Cir.1981).

On October 31, 1991, the Statewide Reapportionment Advisory Committee and others filed a suit (the *"SRAC"* case)[17] substantially similar to the *Burton* case and moved, pursuant to Fed.R.Civ.P. 42(a), to consolidate the two cases. Consolidation was ordered November 13, 1991. The subsequent requests to intervene in the *Burton/SRAC* case by the Democratic Party of South Carolina and Kimberly Burch were also granted.[18]

On December 12, 1991, Bufort Blanton, Neil A. Vander Linden, Forrest E. Ott, Ann Y. Hart, Peggy A. Dufek, and Vincent Johnson filed suit (the *"Blanton"* case)[19] against the state government officers named in the *Burton/SRAC* case, as well as various members of the General Assembly, alleging the county legislative delegation system is constitutionally flawed.[20] The *Blanton* plaintiffs moved to consolidate their case with the *Burton/SRAC* case and consolidation was ordered January 14, 1992. It was agreed before the commencement of the instant trial that the *Blanton* case would be bifurcated from the *Burton/SRAC* case insomuch as any

---

**14.** Under S.C.Code Ann. § 2–1–180, "[t]he regular session of the General Assembly shall adjourn *sine die* each year not later than 5:00 p.m. on the first Thursday in June."

**15.** Civil Action No. 3:91–2983–1.

**16.** Executive Director Ellisor was ultimately dismissed by agreement of the parties.

**17.** Civil Action No. 3:91–3310–1.

**18.** Ultimately, Burch was dismissed by consent of the parties.

**19.** Civil Action No. 2:91–3635–1.

**20.** In South Carolina, certain positions and vacancies on state and county commissions and boards are filled by that county's legislative delegation, which is comprised of Senate and House members who represent any part of that county. *E.g.,* S.C.Code Ann. §§ 4–27–520, 43–3–10, 50–13–70, 51–13–1110 (1976).

claims involving the constitutionality of the state's county legislative delegation system would necessarily depend upon how, if at all, the new Senate and House plans affected county lines. In addition, this court noted the causes of action raised in the *Blanton* case were not appropriate for consideration by a three-judge panel.[21]

Motions to dismiss and to stay the proceedings were filed by various parties throughout the pre-trial stage on grounds the controversy was not ripe.[22] Essentially the moving parties argued the Senate and House were not at an impasse with one another nor collectively with the Governor and hope remained that plans acceptable to both the General Assembly and the Governor might yet be passed.

When the session reconvened,[23] under cloud of judicial intervention, both S. 1003 and H. 3834 were passed, separately, by the General Assembly. On January 29, 1992, Governor Campbell vetoed both bills. His veto messages urged the Senate and House to create more minority districts in their respective bodies and urged the Senate to enhance the minority districts which had been drawn in S. 1003. The veto message went on to express, ostensibly, the Governor's desire to meet with leaders of the Senate and the House to discuss proposed changes to the two bills.[24] The Governor's vetoes were sustained. As for the Congressional redistricting plans, both the Senate and the House passed separate bills and a conference committee was formed to study the differences with an eye towards compromise; however, no Congressional redistricting plan was ever passed by the General Assembly.

All motions to dismiss or stay were either withdrawn or resolved as moot at the February 10, 1992 pre-trial conference, and the cases were set for trial to commence February 18, 1992. On the morning of the 18th, confronted with the novel circumstance of hearing testimony and receiving evidence on the redistricting of three distinct legislative bodies, the court separated the trial into three phases: the Senate phase, the House phase, and the Congressional phase to be tried in turn. Confronted further with the unusual complexity and difficulty surrounding computer generated redistricting plans and faced with the prospects of drawing and generating its own plan, the court appointed Bobby M. Bowers, Director of the Division of Research of Statistical Services of the State Budget and Control Board, as technical advisor to the court pursuant to the inherent discretion of the court and under the authority of *Reilly v. U.S.*, 863 F.2d 149 (1st Cir.1988).[25]

Five plans were proposed during the Senate phase as well as the House phase. To be expedient, certain portions of testimony offered during the Senate phase were in-

---

**21.** Since the court has developed our own plans for both state legislative bodies, we order that the issue of the constitutionality of the county delegation system in South Carolina be deconsolidated from this action and a separate trial before a single judge of the district court be conducted on that issue if the plaintiffs still intend to pursue their cause of action in light of the court's holding. Pursuant to Fed. R.Civ.P. 42(b) and in view of the changed circumstances upon which the *Blanton* plaintiffs' claim is based, such an action is conducive to expedition and judicial economy. Further, pursuant to Fed.R.Civ.P. 54 and given the impending elections, this court makes an express determination that there is no just cause for delay and expressly orders an entry of judgment as to all other claims in these consolidated actions.

**22.** "Ripeness is an amorphous legal concept subject to many 'subtle pressures including the appropriateness of the issues for decision by this Court and the actual hardship to the litigants of denying them the relief sought.'" *Carstens v. Lamm*, 543 F.Supp. 68, 76 (D.Colo.1982) (quoting *Poe v. Ullman*, 367 U.S. 497, 508, 81 S.Ct. 1752, 1759, 6 L.Ed.2d 989 (1961)).

**23.** S.C. Const. Art. III, § 9 provides "[t]he first session of the General Assembly elected under this Constitution shall convene in Columbia on the second Tuesday in January, in the year Eighteen hundred and Ninety-seven, and thereafter annually at the same time and place."

**24.** Like the Senate and the House, Governor Campbell had access to sophisticated computer software and employed a trained operator; the results of which are the Governor's proposed plans for redistricting the Senate, House, and Congress discussed more fully *infra*.

**25.** Mr. Bowers was not appointed as an expert under Fed.R.Evid. 706 or a special master under Fed.R.Civ.P. 53.

corporated by reference into the record of the House and Congressional phases.

Trial concluded March 6, 1992. This court has considered the testimony and evidence received and concludes none of the plans proposed for the redistricting of South Carolina's Senate, House, and Congressional districts fully comports with the objectives and criteria which should be incorporated in a judicially approved plan. Consequently, the court has drawn its own plans which satisfy all relevant constitutional and statutory requisites. The plan for each body is set forth narratively, numerically, and demographically following a discussion of the law applicable to this case.

## II

### SECTION 5 of the VOTING RIGHTS ACT

Before discussing the individual plans proposed by the parties or the plans this court has chosen as an interim remedy, the court sets forth certain principles of law which guide our evaluation of the proposed plans and the choice of remedy.

When enacted in 1965, Congress intended the Voting Rights Act to "banish the blight of racial discrimination in voting"[26] by increasing the ability of racial minorities, primarily Southern blacks, to participate in the electoral process. At first, the goal of enfranchising Southern blacks was achieved through increased voter registration among minorities. Since 1965, however, the focus of the Voting Rights Act has shifted from providing minorities with equal access to the voting booth to providing minorities with an equal opportunity to elect the candidates of their choice. This shift is evident in the cases which have interpreted the Voting Rights Act and in the legislative history of the 1982 amendments to the Voting Rights Act.[27] Since this proceeding arises under § 5 of the

Voting Rights Act, we begin with a discussion of the law under that section.

### A

### Deference to State Policies

Redistricting of the South Carolina General Assembly and the South Carolina Congressional delegation is, first and foremost, a state legislative responsibility rather than a federal judicial task. *Wise v. Lipscomb,* 437 U.S. 535, 539, 98 S.Ct. 2493, 2496, 57 L.Ed.2d 411 (1978). Nonetheless, as noted above, the court has concluded, based on the representations of the parties and the evidence of record, that the legislative process was and is irretrievably deadlocked with respect to redistricting and that no plans could be enacted and properly precleared through the United States Department of Justice in time to hold regularly scheduled elections. It is, therefore, necessary for this court to assume the "unwelcome obligation" of devising and approving redistricting plans for the General Assembly and the Congressional delegation pending some resolution of the legislative deadlock at a later time. *Connor v. Finch,* 431 U.S. 407, 415, 97 S.Ct. 1828, 1834, 52 L.Ed.2d 465 (1977); *Wise,* 437 U.S. at 540, 98 S.Ct. at 2497.

Discharge of the duty thrust upon this court requires us to adhere more strictly than state legislatures to those constitutional and statutory standards governing the redistricting process. *Wise,* 437 U.S. at 540, 98 S.Ct. at 2497. A federal court must act "circumspectly, and in a manner 'free from any taint of arbitrariness or discrimination.'" *Finch,* 431 U.S. at 415, 97 S.Ct. at 1834 (quoting *Roman v. Sincock,* 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620 (1964)).

■ In fashioning interim relief where state political actors have failed to produce redistricting plans, this court, in both legislative and congressional redistricting, "should follow the policies and preferences

---

26. *South Carolina v. Katzenbach,* 383 U.S. 301, 308, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966), *quoted in* S.Rep. No. 97–417, 97th Cong. 2d Sess. 118 (1982) U.S.Code Cong. & Admin. News 1982, p. 177 (hereinafter "Senate Report").

27. Senate Report at 119.

of the State, expressed in statutory and constitutional provisions or in reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution." *White v. Weiser*, 412 U.S. 783, 795, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973); *see also Upham v. Seamon*, 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982) (per curiam). Decisions made by "the legislature in pursuit of what are deemed important state interests ... should not be unnecessarily put aside in the course of fashioning relief. ..." *Weiser*, 412 U.S. at 796, 93 S.Ct. at 2355. While "[t]he remedial powers of an equity court must be adequate to the task ... they are not unlimited." *Whitcomb v. Chavis*, 403 U.S. 124, 161, 91 S.Ct. 1858, 1878, 29 L.Ed.2d 363 (1971).

State policy may be found in a state's constitution or in the legislative enactments of the state. S.C. Const., Art. VII, § 13, which provides "[t]he General Assembly may at any time arrange the various counties into Judicial Circuits, and into Congressional Districts ... as it may deem wise and proper ...," reflects a state policy of maintaining the integrity of county boundaries in the redistricting process. *See South Carolina State Conf. of Branches of the NAACP v. Riley*, 533 F.Supp. 1178 (D.S.C.1982); *McLure v. McElroy*, 211 S.C. 106, 44 S.E.2d 101, 105 (1947). A historical analysis of the redistricting efforts of the South Carolina Senate also evidences this policy.

In 1966, in the wake of the seminal Voting Rights Act case of *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the General Assembly was first confronted with the task of redistricting itself on the basis of population. The result was passage of a compromise plan which "divide[d] the state, *along county lines*, into 27 election districts from which fifty sena-

tors [would] be chosen." *O'Shields v. McNair*, 254 F.Supp. 708, 710 (D.S.C.1966) (emphasis added). Thus, the Assembly was willing to enlarge the Senate to fifty members, despite a clear state constitutional proscription against such an action,[28] to avoid cutting county lines.

■ The Senate was next redistricted in 1972. S.C.Code Ann. § 2–1–60 (1976). There, the General Assembly made specific findings of fact and statements of policy included within its plan, the first of which reads:

> 1. It is the public policy of this State that counties, as constitutionally recognized political subdivisions of this State, shall be treated as basic units to construct election districts for the reapportionment of the Senate ... and it is the public policy of the State that in reapportioning the Senate ... county boundaries should not be disturbed....

Thus, in the quarter century since *Reynolds* the General Assembly has consistently stated, through its plans and specific statements of policy, that among the various state policies, preserving county lines should enjoy a preeminent role in South Carolina's redistricting process. This preeminence is highly rational.[29]

■ As a final note, it was suggested at trial that the plans submitted by the respective legislative bodies were state policy and were entitled to deference. We need not decide this issue because none of the districting plans proffered to the court was enacted into law as state policy. *See* S.C. Const. Art. IV, § 21 (all laws require passage by General Assembly and signature of the Governor); *See also Carstens*, 543 F.Supp. at 79. Unenacted legislative or gubernatorial plans may only be considered evidence of "proffered current policy." *Id.*

---

**28.** *See infra* note 52.

**29.** "Political subdivisions should remain undivided whenever possible because the sense of community derived from established governmental units tends to foster effective governmental representation. Unnecessary fragmentation of these units not only 'undermines the

ability of constituencies to organize effectively but also ... increases the likelihood of voter confusion regarding other elections based on political subdivision geographics.'" *Carstens*, 543 F.Supp. at 88 (quoting American Bar Association on Election Law and Voter Participation, *Congressional Redistricting*, at 12 (1981)).

## B

### Equality of Population and Variances

#### 1. *Congressional Plan*

■ Redistricting plans for congressional districts are subject to stringent equal population requirements. In *Karcher v. Daggett*, 462 U.S. 725, 730, 103 S.Ct. 2653, 2658, 77 L.Ed.2d 133 (1983), the Supreme Court noted, "Article 1, § 2 [U.S. Const.] 'permits only limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown.'" *Karcher,* 462 U.S. at 730, 103 S.Ct. at 2658 (quoting *Kirkpatrick v. Preisler,* 394 U.S. 526, 531, 89 S.Ct. 1225, 1229, 22 L.Ed.2d 519 (1969)). "[T]here are no *de minimis* population variations, which could be avoided, but which nonetheless meet the standard of Art. 1, § 2, without justification." *Karcher,* 462 U.S. at 734, 103 S.Ct. at 2660.

*Karcher* sets forth a two-pronged inquiry for assessing any variation in districts from a standard of equality: (1) Does a plan represent a good-faith effort to draw districts of equal population; and (2) Is any "significant" variance between districts necessary to achieve some legitimate state goal? *Id.* at 731, 103 S.Ct. at 2658; *Anne Arundel County Republican Central Committee v. State Administrative Board of Election Laws,* 781 F.Supp. 394, 396 (D.Md.1991).

The first prong of the *Karcher* test is essentially a comparative exercise: What are the deviations from equality existing in the proffered plans? *Cf. Karcher,* 462 U.S. at 739–40, 103 S.Ct. at 2662–63 (alternate plans with lower population deviation were presented to legislature); *Hastert v. State Board of Elections,* 777 F.Supp. 634, 644 (N.D.Ill.1991) (two plans compared for deviation). As to the second prong of the test, important state goals justifying "significant" variations include, but are not necessarily limited to, "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." *Karcher,* 462 U.S. at 740, 103 S.Ct. at 2663.

#### 2. *General Assembly Plans*

■ The rigorous standard of population equality demanded of congressional districts under U.S. Const. Art. 1, § 2, is not equally applicable to redistricting of state legislative districts. *Karcher,* 462 U.S. at 732–33, 103 S.Ct. at 2659–60. Such districts are governed by the one man, one vote principle inherent in the Equal Protection Clause of the Fourteenth Amendment. *Reynolds,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

■ After holding both houses of a state legislature must make an honest and good faith effort to apportion on the basis of nearly equal population, *Id.* at 577, 84 S.Ct. at 1389, the *Reynolds* Court explained its reasoning by adding "we realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens or voters. Mathematical exactness or precision is hardly a workable constitutional requirement." *Id.* Thus, in redistricting state assemblies, "both houses of the state legislature must be apportioned so that districts are 'as nearly of equal population as is practicable.'" *Chapman v. Meier,* 420 U.S. 1, 22, 95 S.Ct. 751, 763, 42 L.Ed.2d 766 (1975) (quoting *Reynolds,* 377 U.S. at 577, 84 S.Ct. at 1390). "[S]ubstantial compliance" with the goal of equality, not absolute arithmetic equality, is required. *Chapman,* 420 U.S. at 22, 95 S.Ct. at 763. Unlike redistricting of congressional districts, the Supreme Court has specifically acknowledged that *de minimis* variation in state legislative districts is permissible in *court-devised* redistricting plans for such assemblies. *Id.* at 26–27, 95 S.Ct. at 765–66; *Connor v. Finch,* 431 U.S. at 414, 97 S.Ct. at 1833. An explanation of and the development of this standard is set forth below.

■ Technology is such today that precise population equality is not only possible but commonplace in state redistricting plans. Thus, the focus has shifted from a question of what can practicably be done to a question of what is desirable within a redistricting process. Despite technologi-

cal modernity, state legislatures remain free to apportion themselves outside the boundaries of mathematical precision, but only if the deviation is "minor" and "based on legitimate considerations incident to the effectuation of a rational state policy." *Chapman*, 420 U.S. at 23–24, 95 S.Ct. at 764. (explaining *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973) and quoting *Reynolds*, 377 U.S. at 579, 84 S.Ct. at 1391)). As a general rule, a legislatively enacted apportionment plan with a maximum deviation under 10 percent falls within this category of minor deviations, *Brown v. Thompson*, 462 U.S. 835, 842, 103 S.Ct. 2690, 2695, 77 L.Ed.2d 214 (1983), whereas a plan with larger disparities in population creates a *prima facie* case of discrimination and must therefore be justified by the state. *Id.* at 842–43, 103 S.Ct. at 2695–96.

■ The function of this court, however, is much different from that of a state legislature. It is axiomatic by now that redistricting is primarily a matter for legislative consideration and determination. *Wise v. Lipscomb*, 437 U.S. 535, 539, 98 S.Ct. 2493, 2496, 57 L.Ed.2d 411 (1978). This is chiefly because a state legislature is better situated to identify and recommend traditional state policies within the constitutionally mandated framework of substantial population equality. *Connor v. Finch*, 431 U.S. at 414–15, 97 S.Ct. at 1833–34. In sharp contrast, this court possesses no distinctive mandate to compromise potentially conflicting state redistricting policies in the people's name. *Id.* at 415, 97 S.Ct. at 1834. Rather, we are admonished to "achieve the goal of population equality with little more than *de minimis* variation." *Chapman*, 420 U.S. at 27, 95 S.Ct. at 766. Given that compliance with the principles of one man, one vote is the preeminent concern of court-ordered plans, the very real possibility exists that certain state policies will be compromised in a court-ordered plan which could have been better served had judicial intervention not been necessary.

Although all concede this process is to be guided by the *de minimis* standard, this standard should be clearly elucidated. *Chapman*, the seminal case on court-or-

dered redistricting plans for state legislatures, holds merely this:

... unless there are persuasive justifications, a court-ordered reapportionment plan of a state legislature must avoid use of multimember districts, and, as well, must ordinarily achieve the goal of population equality with little more than *de minimis* variation. [footnote omitted]. Where important and significant state considerations rationally mandate departure from these standards, it is the reapportioning court's responsibility to articulate precisely why a plan of single-member districts with minimal population variance cannot be adopted.

*Id.* at 26–27, 95 S.Ct. at 766.

■ There is no definition or demarcation of the *de minimis* standard offered except to say district courts are not required to "attain the mathematical preciseness required for congressional redistricting." *Id.* at 27 n. 19, 95 S.Ct. at 766 n. 19. While population equality may well have been the goal of the *Chapman* Court, it was not the requirement. Rather, the opinion clearly states "[w]ith a court-ordered plan, any deviation from approximate population equality must be supported by enunciation of historically significant state policy or unique features." *Id.* at 26, 95 S.Ct. at 765–66. Thus, this quote equates approximate population equality directly with the *de minimis* standard. In sum, the *de minimis* standard is approximate population equality, not exact population equality *coupled with* justification.

■ Under this theory, there are but three types of court-ordered state redistricting plans: 1) those plans which meet the standard of *de minimis* deviation, 2) those plans which do not meet the *de minimis* standard but whose departure is justified by the court; and 3) those plans which neither meet the standard nor are justified. A non-exhaustive list of state policy factors which might justify greater than *de minimis* variations includes: maintenance of county or other political subdivision boundaries, *Connor v. Finch*, 431 U.S. at 419, 97 S.Ct. at 1836; compactness and contiguity of legislative districts; and recognition of

historical and natural boundaries, *Meier,* 420 U.S. at 23, 95 S.Ct. at 764. See also *Karcher,* 462 U.S. at 740, 103 S.Ct. at 2663 (listing factors justifying possible deviations from equality).

■■■■ If a plan meets the *de minimis* standard, there need not be any discussion of state policy unless there are other plans which are constitutionally acceptable. Then, of course, a discussion of a state's policies and unique features is relevant, and in fact necessary, to determine which of the constitutionally acceptable plans best serves those policies or unique features. Importantly, the standard by which the court chooses from among acceptable plans is not the same standard by which a court would have to justify departure from the *de minimis* standard in the first instance. *Cf. Connor v. Finch,* 431 U.S. at 420–421, 97 S.Ct. at 1836–37.[30]

If the court must, as some assert,[31] elucidate the reasons behind any departure from exact population equality and articulate clearly the relationship between the deviation and the state policy furthered, then there is no cognizable distinction between the *de minimis* standard and the standard for congressional redistricting. Assuredly, this was not the aim of the *Chapman* Court as footnote 19 clearly evidences. As support for this footnote, the Court cited a litany of cases, including *Kirkpatrick v. Preisler,* 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), in which the Court refused an invitation to apply the *de minimis* standard to congressional redistricting. In discussing the proposed *de minimis* standard in *Kirkpatrick,* the Court offered an illuminating, if not dispos-

itive, description of the *de minimis* standard:

> We reject Missouri's argument that there is a fixed numerical or percentage population variance small enough to be considered *de minimis* and to satisfy without question the 'as nearly as practicable' standard. The whole thrust of the 'nearly as practicable' approach is inconsistent with the adoption of fixed numerical standards which excuse population variances without regard to the circumstances of each particular case ... There are other reasons for rejecting the *de minimis* approach. We can see no nonarbitrary way to pick a cutoff point at which population variances suddenly become *de minimis*.

*Id.* at 530–31, 89 S.Ct. at 1228–29.

■■■■ Thus, it is clear the *Chapman* Court knew full well that the advantages, or disadvantages, of the *de minimis* standard included "a fixed numerical or percentage population variance small enough to be considered *de minimis* ... *without question.*" *Kirkpatrick,* 394 U.S. at 530, 89 S.Ct. at 1228. (emphasis added). Not only did the *Chapman* Court not take pains to distinguish the characteristics proposed in *Kirkpatrick,* which dealt with *congressional* plans, it cited to *Kirkpatrick* immediately upon announcing the new rule for court-ordered plans for state legislatures. *Chapman,* 420 U.S. at 27 n. 19, 95 S.Ct. at 766 n. 19. Thus, it is patently clear to this court the *de minimis* standard, with regard to *state* legislative bodies, "excuse[s] population variances *without regard to the circumstances of each particular case,*" which is precisely what the *Chapman* opinion intended. *Kirkpatrick,*

---

**30.** If, in selecting among constitutionally acceptable plans, the court orders one plan to the exclusion of "statistically less offensive plans," it must provide rationale for its decision. *Chapman,* 420 U.S. at 26, 95 S.Ct. at 765. Conversely, if a court attempts to rehabilitate a plan which does not meet the *de minimis* requirement in the first instance, it must "articulate clearly the relationship between the variance and the state policy furthered." *Id.* 420 U.S. at 24, 95 S.Ct. at 764.

**31.** Despite footnote 19 in *Chapman,* one school of thought reads *Chapman* to mean the *de min-*

*imis* standard is exact population equality coupled in every instance of deviation with justification by reference to state policies or unique features. Julie Edwards, Comment, *The Right to Vote and Reapportionment in the Texas Legislature,* 41 Baylor L.Rev. 689 (1989). This theory issues from that portion of *Chapman* which reads: "[t]he burden is on the District Court to elucidate the reasons necessitating any departure from the goal of population equality, and to articulate clearly the relationship between the variance and the state policy furthered." *Id.* at 24, 95 S.Ct. at 764.

394 U.S. at 530, 89 S.Ct. at 1228. (emphasis added).

[18] In addition to representing a lucid reading of *Chapman* and *Kirkpatrick*, this conclusion protects the established trichotomy between state legislative plans enacted by state legislatures, state legislative plans ordered by courts, and congressional reapportionment plans. We conclude, without quantifying the *de minimis* standard,[32] that the standard lies somewhere between the 10 percent presumption of *Brown* and the mathematical preciseness required for congressional redistricting under *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), and in the opinion of this court, it lies closer to *Wesberry* than *Brown*.[33]

### C

### Dilution of Minority Voting Opportunities

 The redistricting of the General Assembly and the Congressional delegation of the state reflects a change in voting procedures and practices which would require preclearance under § 5 of the Voting Rights Act, 42 U.S.C. § 1973c, if the General Assembly and Governor had discharged their respective duties in such manner that redistricting plans were enacted. *Georgia v. United States*, 411 U.S. 526, 535, 93 S.Ct. 1702, 1708, 36 L.Ed.2d 472 (1973). Because, as set forth below, the court does not adopt any plan proffered to the court by the parties *in toto*, but rather has fashioned its own remedial plans as to the General Assembly and congressional seats, such preclearance is not required for the court's plans to take effect. *McDaniel v. Sanchez*, 452 U.S. 130, 138, 101 S.Ct. 2224, 2230, 68 L.Ed.2d 724 (1981) ("[T]he Act's preclearance requirement does not apply to

plans prepared and adopted by a federal court to remedy a constitutional violation").

In fashioning relief, however, the court must be cognizant of § 5 concerns that voting changes have neither the "purpose . . . [nor] the effect of denying or abridging the right to vote" on the basis of race. 42 U.S.C. § 1973c. *See McDaniel*, 452 U.S. at 148–49, 101 S.Ct. at 2235–36. We take it as a given that this court, in fashioning its remedy, is not acting with a racially discriminatory purpose. *See Seamon v. Upham*, 536 F.Supp. 931, 944 (E.D.Tex), *vacated and remanded on other grounds sub. nom., Upham v. Seamon*, 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982) (per curiam).

 In assessing a proposed plan for discriminatory effect under § 5, the Supreme Court has set forth a "retrogression" standard. *Beer v. United States*, 425 U.S. 130, 141, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976); *City of Lockhart v. United States*, 460 U.S. 125, 103 S.Ct. 998, 74 L.Ed.2d 863 (1983). As set forth in *Beer*, the application of retrogression analysis is "straightforward." *Id.*, 425 U.S. at 142, 96 S.Ct. at 1364. In *Beer*, the Supreme Court compared "the position of racial minorities with respect to their effective exercise of the electoral franchise" under the plan of apportionment as it existed immediately before the proposed change and the position of racial minorities after implementation of the change. *Id.* at 142, 96 S.Ct. at 1364. Thus, where under the old plan no district had a majority of minority population or voters; and under the new plan two districts had majority-minority populations, and one of those districts also contained a majority of minority voters, no retrogression occurred and the plan was valid under § 5. *Id.; See also City of Lockhart*, 460 U.S. at 135, 103 S.Ct. at 1004

---

**32.** "Neither courts nor legislatures are furnished any specialized calipers that enable them to extract from the general language of the Equal Protection Clause of the Fourteenth Amendment the mathematical formula that establishes what range of percentage deviations is permissible, and what is not." *Mahan v. Howell*, 410 U.S. 315, 329, 93 S.Ct. 979, 987, 35 L.Ed.2d 320 (1973).

**33.** The *Chapman* Court opined that court-ordered reapportionment of a state legislature need not attain the preciseness required for congressional redistricting, but the Court also "refused to assume that a 5.95% deviation would necessarily satisfy the high standards required of court-ordered plans." *Connor v. Finch*, 431 U.S. at 418 n. 17, 97 S.Ct. at 1835 n. 17.

(where minorities are in at least the same position with respect to electoral opportunities before and after a change, no retrogression occurs). Thus, retrogression refers to diminution in minority opportunity from what it had been under an earlier plan. *See* discussion, *infra,* regarding "majority/opportunity" districts, page 1354. The Department of Justice regulations pertaining to retrogression utilize this same benchmark: "In determining whether a submitted change is retrogressive the Attorney General will normally compare the submitted change to the voting practice or procedure in effect at the time of the submission." 28 C.F.R. § 51.54 (1991).

[21] The court notes two permissible bases and one false basis for assessing

retrogression. Retrogression may be measured by simply comparing the gross number of districts with minority population and voting majorities in the old plan and the number of such districts drawn in the proposed plan. This was essentially the approach taken in *Beer. See also Ketchum v. Byrne,* 740 F.2d 1398, 1402 n. 2 (7th Cir.1984). There are two possible points at which to measure minority voting opportunities under an old plan: (1) at the time the old plan was originally drawn, or (2) at the time the new plan is proposed to replace the old plan. The point is illustrated by reference to the old General Assembly plans in this case. As originally drawn using 1980 census figures, the State Senate contained ten districts with total black population majorities; the State House of Representative contained 26 such districts.[34]

**34.** The following table sets forth total and voting age (BVAP) population percentages for the majority black districts in the old plans for the General Assembly using 1980 census figures and 1990 census figures:

Senate

| Dist. | 1980 Census | | 1990 Census | | Current Pop. |
|---|---|---|---|---|---|
| | %Blk. | %BVAP | %Blk. | %BVAP | Deviation % |
| 7* | 50.23 | 45.31 | 52.35 | 48.15 | −17.80 |
| 19* | 58.75 | 54.48 | 56.47 | 53.90 | +07.28 |
| 21 | 50.83 | 48.04 | 54.30 | 50.86 | −17.89 |
| 30* | 59.30 | 55.51 | 58.34 | 54.61 | −17.54 |
| 32 | 58.15 | 53.90 | 59.85 | 55.15 | −16.06 |
| 36 | 63.24 | 59.15 | 62.51 | 58.61 | −11.81 |
| 39* | 59.18 | 55.25 | 60.39 | 56.51 | −12.47 |
| 40 | 50.69 | 48.20 | 54.06 | 51.90 | −12.66 |
| 42* | 59.13 | 53.54 | 63.28 | 57.02 | −24.37 |
| 45* | 54.60 | 50.53 | 55.02 | 50.88 | +00.96 |

House

| Dist. | %Blk. | %BVAP | %Blk. | %BVAP | Deviation % |
|---|---|---|---|---|---|
| 23* | 68.44 | 60.53 | 69.69 | 65.01 | −22.43 |
| 31* | 64.47 | 58.62 | 72.15 | 65.91 | −18.86 |
| 41 | 55.71 | 57.07 | 55.92 | 51.91 | −08.84 |
| 49* | 54.73 | 52.18 | 49.92 | 47.30 | +00.75 |
| 50 | 60.04 | 55.25 | 60.55 | 56.30 | −13.38 |
| 57 | 48.01 | 44.98 | 51.87 | 47.19 | −11.49 |
| 59 | 51.89 | 47.57 | 55.83 | 51.17 | −12.09 |
| 62* | 62.58 | 59.28 | 65.00 | 61.10 | −17.71 |
| 64 | 55.64 | 51.67 | 54.34 | 50.28 | −06.35 |
| 66* | 71.93 | 68.88 | 72.71 | 69.69 | −17.52 |
| 70* | 60.26 | 57.71 | 63.07 | 60.35 | −18.15 |
| 73* | 73.64 | 68.68 | 82.01 | 78.44 | −25.68 |
| 74* | 67.85 | 62.29 | 76.83 | 71.79 | −20.08 |
| 77* | 64.02 | 59.00 | 61.87 | 58.77 | −14.92 |
| 90 | 58.10 | 54.53 | 62.91 | 58.95 | −18.55 |
| 93 | 53.40 | 51.23 | 51.56 | 48.73 | −00.52 |
| 94* | 65.00 | 61.06 | 64.50 | 59.76 | −10.80 |
| 95 | 62.71 | 60.70 | 67.17 | 65.04 | −17.58 |
| 101* | 70.79 | 66.32 | 72.96 | 68.64 | −11.82 |
| 102* | 57.11 | 53.70 | 56.96 | 53.63 | −05.46 |
| 103 | 51.92 | 48.13 | 52.62 | 48.10 | −08.40 |
| 109* | 55.90 | 48.55 | 67.30 | 65.16 | −37.09 |
| 110 | 53.83 | 46.50 | 42.50 | 36.41 | −20.79 |
| 111* | 60.95 | 55.43 | 71.74 | 67.23 | −18.53 |
| 116* | 61.82 | 57.65 | 54.25 | 50.26 | −05.07 |
| 120 | 50.12 | 46.49 | 52.09 | 47.44 | −10.10 |
| 122* | 51.25 | 48.10 | 54.26 | 51.82 | −04.38 |

When 1990 census figures are applied to the Senate districts, each retains a majority black population, though the total percentage of blacks decreased in three of the ten districts as a result of "natural retrogression." *See, supra,* note 34. In the State House, application of the 1990 figures shows that eight of the districts declined in percentage of black population, and two districts actually became majority white districts. *Id.* This "natural retrogression" reflects either black emigration from existing black majority districts in greater proportion than whites (House Dist. 110 Charleston County), or an influx of proportionally greater numbers of whites into a district (House Dist. 49, Rock Hill, York County). The Department of Justice regulations suggest that use of the most current census data as applied to the old plan serves as an appropriate benchmark from which to measure the effect of the new plan:

> In determining whether a submitted change is retrogressive the Attorney General will normally compare the submitted change to the voting practice or procedure in effect at the time of submission.... The Attorney General will make the comparison *based on the conditions existing at the time of the submission.*

28 C.F.R. § 51.54 (1990) (emphasis added); *See also Ketchum,* 740 F.2d at 1402.

■ A second possible and permissible means of evaluating retrogression could involve a district by district comparison of black population and voting age population in the old and new plans. This comparison, however, has great potential to mislead. Where a new plan does not substantially reincorporate the geographic territory of black majority districts from the old plan, the comparison diminishes in value. Where, as in South Carolina, black majority districts are generally geographically contiguous and have suffered dramatic declines in population through natural retrogression, see note 34, *supra,* it may be necessary to shift black population from one district to another, or bring additional white population into a district to satisfy one man, one vote constitutional requirements. Such shifting of population can make district by district comparisons meaningless. Consequently, the court looked first to retrogression in the total number of districts in a given plan and only then to decreases in population within a given district, where meaningful comparisons, if any, could be made.

■ The erroneous basis for measuring retrogression, urged upon the court by certain parties to this suit, is to compare proffered plans one to another without reference to the existing plan. This proposed methodology is flawed in at least two respects. First, it has no basis in case law, the statutes, or § 5 regulations. See *Beer,* 425 U.S. at 142, 96 S.Ct. at 1364 (comparison of proposed plan to existing plan); *City of Lockhart,* 460 U.S. at 134–36, 103 S.Ct. at 1004–05 (same); *Ketchum,* 740 F.2d at 1402 (same); 28 C.F.R. § 51.54(b) (benchmark is the old plan).[35] Second, such meth-

---

Those districts designated with a "*" are currently occupied by a black senator or representative.

At trial, the parties operated under the assumption that the State House of Representatives, as originally drawn, contained 27 districts with majority-minority populations. District 57 did not, in fact, contain such a majority. S.C.Code § 2–1–10; Summary Tape File (STF 1A, 1B), 1980 Decennial Census.

35. *Wilkes County, Ga. v. United States,* 450 F.Supp. 1171 (D.D.C.1978) was cited as supporting the proposition of interplan comparison. In *Wilkes County,* the county's board of commissioners was originally composed of a mayor, elected at-large, and four commissioners elected from single-member districts. In 1972, the county attempted to convert to a completely at-large system with a residency requirement as to the four districts. At the time of the proposed change, the single-member districts were severely malapportioned. While the change was ostensibly made to satisfy one man, one vote concerns, the district court found that the change was purposely made to dilute increasing black voting strength. *Id.* at 1176.

In attempting to assess whether or not the new at-large system had the effect of diluting black voting strength, the court made two comparisons. First, the court concluded that if the malapportioned districts had been retained,

odology serves as a "racial ratchet," which presumes that the plan offering the greatest number of black majority districts is, for that reason alone and regardless of all other considerations, the benchmark against which all other plans must be measured. Such an approach enshrines the notion that the Voting Rights Act insures proportional representation by race, a proposition that flies squarely in the face of case law and statute. *See Beer*, 425 U.S. at 141, 96 S.Ct. at 1363; 42 U.S.C. § 1973b.

## III

## SECTION 2 of the VOTING RIGHTS ACT

As previously noted, this proceeding arises under § 5 of the Voting Rights Act.[36] While the provisions of § 5 are directed at specific jurisdictions, the provisions of § 2 are national in scope. Nevertheless, sections 2 and 5 of the Act are not necessarily mutually exclusive and the court has been guided by several aspects of § 2 in developing its remedy. A brief history of the evolution of § 2 is discussed herein and the relationship between sections 2 and 5 is discussed more fully below.

## A

### 1982 Amendments

As amended and in pertinent part, § 2 of the Voting Rights Act of 1965 protects the voting rights of members of protected classes and language minorities and reads as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the state or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one "circumstance" which may be considered, provided that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

As originally passed, the language of § 2 was intended to parallel the language of the Fifteenth Amendment. *City of Mobile v. Bolden*, 446 U.S. 55, 60–61, 100 S.Ct. 1490, 1495–96, 64 L.Ed.2d 47 (1980) (plurality opinion). Based on this parallel, a plurality of the Supreme Court held that a plaintiff was required to prove discriminatory intent to establish a violation of § 2. *Id.* at 62, 71, 100 S.Ct. at 1497, 1501. In response to the Supreme Court's ruling in *City of Mobile v. Bolden*, Congress amended § 2 in 1982 to include a "results," or "effects," test to determine if racial vote dilution has occurred. *See* Senate Report at 27; *Thornburg v. Gingles*, 478 U.S. 30, 35, 106 S.Ct. 2752, 2758, 92 L.Ed.2d 25 (1986).

---

blacks would have exercised more influence than under the new, at-large plan. *Id.* at 1178. Because the change also represented a change in election systems, not simply a redistricting of the same system, the court also thought it appropriate to compare black opportunity under the new plan with a hypothetical properly apportioned district and concluded that such comparison also indicated retrogression. *Id.* This second holding of *Wilkes County* is pure *obiter*

*dicta* in that the finding of purposeful discrimination and unlawful effect under standard comparisons was sufficient to invalidate the proposed change. The hypothetical plan comparison utilized has no utility in a case, such as the present one, where there is no change in the electoral system.

**36.** 42 U.S.C. § 1973c.

## B

### *Thornburg v. Gingles*

In 1986, the Supreme Court had the opportunity to review the amendments to § 2 in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). *Gingles* involved a § 2 challenge to the use of multi-member districts in North Carolina. The Court held that "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Id.* at 47, 106 S.Ct. at 2764.

In determining if a § 2 violation has occurred, "a court must assess the impact of the contested structure or practice on minority electoral opportunities 'on the basis of objective factors.'" *Id.* at 44, 106 S.Ct. at 2763 (quoting Senate Report at 27). The Court then reiterated the list of "typical" factors which may be relevant to, and probative of, a § 2 claim as set forth in the Senate Report. Now known as the "Senate factors," these factors are:

1. the extent of any history of official discrimination in the state or political subdivision that touches the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have added probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* at 37, 45, 106 S.Ct. at 2759, 2763.

The Court noted, as did the Senate Report, that this list is not exhaustive, nor is it required that any number of factors be proved, and other factors may be relevant. *Id.* at 45, 106 S.Ct. at 2763. The Court did note, however, that "the most important Senate Report factors bearing on § 2 challenges to multi-member districts are the 'extent to which minority group members have been elected to public office in the jurisdiction' and the 'extent to which voting in the elections of the state or political subdivision is racially polarized.'" *Id.* at 49 n. 15, 106 S.Ct. at 2765 n. 15.

The Court, however, set forth important limitations on the extent to which these factors establish liability under § 2 by stating:

[w]hile many or all of the factors listed in the Senate Report may be relevant to a claim of vote dilution through submergence in multimember districts, unless there is a conjunction of the following circumstances, the use of multimember districts generally will not impede the ability of minority voters to elect representatives of their choice.

The Court then listed three circumstances which "are necessary preconditions for multi-member districts to operate to

impair minority voters' ability to elect representatives of their choice." *Id.* at 49–50, 106 S.Ct. at 2766. These preconditions [37] are:

1) the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single member district; 2) the minority group must be able to show that it is politically cohesive; and 3) the minority group must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it— in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Id.* at 50, 106 S.Ct. at 2766.

Thus, the *Gingles* decision provided a framework with which to analyze § 2 challenges. The practical application of these factors, however, has been the subject of considerable discussion [38] and it is not entirely clear to what extent *Gingles* applies to the single-member districts involved in this case. Lacking any further guidance, we have applied the decision in *Gingles* as set forth below.

Floating through the framework of *Gingles* and its progeny are several concepts, the definitions of which are important to the court's decision. Briefly, these definitions are 1) How does the court define a "majority?"; 2) What is the definition of "compactness?"; 3) What is the definition of "community of interest?"; and 4) What is the definition of "political cohesion?" Before defining these concepts, however, the court must first address the extent to which it has considered § 2 in its analysis.

## C

### Application of § 2 to this Proceeding

The application of § 2 to this case has its genesis in the admonition of the Supreme Court in *Connor v. Finch*, 431 U.S. 407, 425, 97 S.Ct. 1828, 1839, 52 L.Ed.2d 465 (1977) that "it is imperative for the District Court, in drawing up a new plan, to make every effort not only to comply with the established constitutional standards, but also to allay suspicions and avoid the creation of concerns that might lead to new constitutional challenges." It would be incongruous for the court to adopt a plan which did not comport with the standards and guidelines of § 2. The issue, however, is not whether § 2 considerations are considered—they most certainly are; but rather, whether the court is obligated to completely graft the tests and requirements of § 2, including the searching evidentiary requirements, into a § 5 proceeding.

First, we will establish why a complete adoption of § 2 standards is unwarranted in this proceeding under § 5. Then, we

---

**37.** Although there is some debate over the extent to which the three prongs of *Gingles* must be viewed as threshold requirements for a § 2 remedy, *Solomon v. Liberty County, Florida*, 899 F.2d 1012, 1022 (11th Cir.1990) (en banc) (Tjoflat, J. concurring); Karlan, *Maps and Misreadings: The Role of Geographic Compactness in Racial Vote Dilution Litigation*, 24 Harv.C.R.–C.L.Rev. 173 (Winter 1989) (hereinafter *Maps and Misreadings*), the Court of Appeals for the Fourth Circuit has clearly held that these three prongs are threshold requirements. *McGhee v. Granville, Co., North Carolina*, 860 F.2d 110, 117 (4th Cir.1988). The *McGhee* court based its finding, in part, on the "open-ended nature" of a court's inquiry under the totality of the circumstances test, *Id.* at 116, and its concern that left "unbounded," the totality of the circumstances test could be applied to find dilution in any case where the black minority is not represented in proportion to their percentage of the voting age population, which is clearly contrary to the 1982 amendments to § 2. *Id.*

In addition, the *McGhee* court cited favorably to *McNeil v. Springfield Park District*, 851 F.2d 937 (7th Cir.1988) which stated that "[t]he creation of preconditions—a choice of clear rules over muddy efforts to discern equity—shields the courts from meritless claims and ensures that clearly meritorious claims will survive summary judgment." The court in *McNeil* also noted that the Voting Rights Act, despite being a "crucially important piece of national legislation," remains "subject to the same considerations of administration as other similar statutes." *Id.* at 943.

**38.** *See* Quinn, Sallet, and Simon, *Congressional Redistricting in the 1990s: The Impact of the 1982 Amendments to the Voting Rights Act*, 1 Geo. Mason U.Civ.Rights L.J. 207 (Winter 1990) (hereinafter *"Congressional Redistricting"*); *See* Karlan, *Maps and Misreadings:*, 24 Harv.C.R.–C.L.Rev. 173.

will set forth the standard by which we have reviewed the various plans with respect to § 2 considerations. Finally, we will return to the definition of the four concepts mentioned above.

1. *The Substantive Standards for § 2 Should not be Completely Imported into this § 5 Proceeding*

 Based on three factors, in conjunction with the particularized facts of this case, the court holds that it is not obligated to completely import the standards and requirements of § 2 into a proceeding under § 5. These factors are: 1) the fundamental differences between § 2 and § 5; 2) the particular time factor associated with this case, and 3) the lack of a clear legislative intent or judicial interpretation that the results test of § 2 should be completely imported into § 5.

a. *Important differences between § 2 and § 5*

Although sections 2 and 5 are similar in their goal of providing minorities with an equal opportunity to elect the representatives of their choice, several important differences exist between the sections. First, each section was designed to address different manifestations of the same problem—disenfranchisement of minorities. As noted earlier, the parameters of § 5 were developed in response to the exclusion of primarily Southern blacks from the voting booth through the use of poll taxes, literacy tests, and other overt forms of racial discrimination and the persistence of the covered districts in developing new methods of vote dilution as the former methods were judicially invalidated. *South Carolina v. Katzenbach*, 383 U.S. 301, 384–85, 86 S.Ct. 803, 841–42, 15 L.Ed.2d 769 (1966). As a state with a history of such discrimination, South Carolina is a covered district under § 5.[39] 42 U.S.C. § 1973c.

 Consequently, the original focus of § 5 was to provide minorities in those districts with a history of overt racial discrimination with special protections, which included the preclearance requirement for any *change* in voting procedure. *See Id.* An action under § 5 therefore, must be precleared by the Justice Department or the United States District Court for the District of Columbia. 42 U.S.C. § 1973c. Under § 5, the effect of the new plan is determined by its retrogressive effect on the ability of minorities to elect representatives of their choice. *City of Lockhart v. United States*, 460 U.S. 125, 103 S.Ct. 998, 74 L.Ed.2d 863 (1983); *Beer v. United States*, 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976); *See supra* pages 1345 to 1348.

 Section 2, on the other hand, was national in scope and provided a private right of action to remedy the denial or abridgement of the right to vote. *See Solomon v. Liberty County, Florida*, 899 F.2d 1012, 1023–32 (11th Cir.1990) (en banc) (Tjoflat, J., concurring). As a result, the provisions of § 2 had to address the more subtle forms of race discrimination. *See McGhee v. Granville County, North Carolina*, 860 F.2d 110, 116 (4th Cir.1988). Thus, as the law has evolved under § 2, a broader, "results," test has developed. Senate Report at 23–31. It is important to remember, however, that § 2 involves a challenge to the effects or intent of a *specific* plan and the crucial aspect of the proceeding is the determination of liability. *Gingles*, 478 U.S. at 44, 106 S.Ct. at 2762 (quoting Senate Report at 27).

In turn, the different tests and the different means by which an action under either section proceeds give rise to additional considerations. First, there are the differences in the burden of proof. In a

---

**39.** In *Graham v. State of South Carolina*, No. 84–1430, at 24 (D.S.C. filed July 31, 1984), this court held that "the political processes leading to the nomination and election to public office are equally open to minority races and minority parties." The Lieutenant Governor interprets this remark to mean that the court need only inquire post-1984 for evidence of discrimination. While this may be true in the context of overt forms of discrimination, such as exclusion of blacks from the Democratic Primary as was discussed in *Graham,* in light of the factors enumerated in *Gingles,* we decline to give the language in *Graham* such broad meaning with regard to the *effects* of prior discrimination.

§ 5 proceeding, the jurisdiction proposing the change in the voting structure bears the burden of proof whereas in a § 2 proceeding the plaintiff bears the burden of proof. 42 U.S.C. § 1973c *et seq.* Since a § 2 plaintiff is *attacking* an existing practice and a plan being challenged under § 5 must be *advocated,* the difference in the nature of the proceedings makes the necessity for this allocation obvious. Yet, in the context of this case, in which no less than five plans have been submitted for each political body, the burden of proof becomes more complex, especially if the whole of the results test is injected into the proceeding. The court, which is operating more in the nature of a forum, is thus reluctant to tamper with the burden of proof in the absence of sufficient legislative or judicial guidance.[40]

The differences between § 2 and § 5 also give rise to several concerns regarding the advisory nature of an opinion of a three-judge panel that the adopted plans completely conform to § 2 criteria. First, there is the obvious difficulty that in the broad spectrum of the "results" test of § 2, any testimony regarding the effect of the proposed plans is sheer speculation. In a § 5 proceeding, this difficulty is minimized by the focus on retrogression—a relatively finite concept. *See supra* pages 1345 to 1348.

▮▮▮▮ Second, under existing law, if a plan has been precleared by the Justice Department, an individual is still entitled to bring a § 2 challenge against the plan.[41] Similarly, when a district court approves or adopts a legislatively approved plan in a § 2 proceeding that is not of its own making, the plan is still subject to § 5 review.

*McDaniel v. Sanchez,* 452 U.S. 130, 150, 101 S.Ct. 2224, 2236, 68 L.Ed.2d 724 (1981). Our concern, however, is that by completely grafting the requirements of § 2 into § 5, the court would impair the duality of remedies currently afforded aggrieved parties under principles of *res judicata* or separation of powers. We do not resolve this issue today; however, this issue is indicative of the potentially broad reaching effects of importing § 2 into § 5.

b. *Time considerations*

Time is also a crucial factor for the court. The fact finding requirements under § 2 are strenuous and appellate courts have required great specificity with regard to the facts determined by local district courts in a § 2 proceeding. *Westwego Citizens for Better Government v. City of Westwego,* 872 F.2d 1201, 1203 (5th Cir. 1989); *Watkins v. Mabus,* 771 F.Supp. 789, 799 (S.D.Miss.1991) *aff'd in part, vacated in part* —— U.S. ——, 112 S.Ct. 412, 116 L.Ed.2d 433 (1991) (vacated on other grounds). Yet, courts have also recognized that with elections pending on the horizon, the exigency of the circumstances in voting rights cases mandate special consideration. *Upham v. Seamon,* 456 U.S. 37, 44, 102 S.Ct. 1518, 1522, 71 L.Ed.2d 725 (1982); *Mabus,* 771 F.Supp. at 799.

As stated above, no less than five plans were submitted for each political body; and in the case of the Congressional districts, a total of nine plans were offered. The scant case law [42] which advocates a complete incorporation of § 2 into § 5 involves cases where at most two or three plans were under consideration for a single legislative body.[43] Aside from the burden of proof

---

**40.** *See County Council v. United States,* 555 F.Supp. 694, 698 (D.D.C.1983) ("Whether ... the "results" standard of Section 2 can properly be imported in Section 5 presents a complex issue which can be decided only after a comprehensive assessment of the statutory scheme and the legislative history") *cited in* Mark E. Haddad, Note, *Getting Results under Section 5 of the Voting Rights Act,* 94 Yale L.Rev. 139, 149 n. 75 (1984) (hereinafter *"Getting Results"*).

**41.** As discussed *infra,* the Justice Department has incorporated the results test into its analysis under § 5. Nevertheless, the court is unaware

of any case which has challenged the validity of this action.

**42.** *Edge v. Sumter County School District,* 775 F.2d 1509, 1510 (11th Cir.1985); *Hastert v. State Bd. of Elections,* 777 F.Supp. 634 (N.D.Ill.1991).

**43.** The court notes that in our study of the cases under section 5 and section 2, we can find no case in which both bodies of the state legislature as well as the congressional districts for an entire state were redistricted in a single action.

The academic literature advocating the incorporation of the § 2 substantive standard in § 5

difficulties discussed above, the evidentiary burden presented by a § 2 challenge to each proposed plan in this case would have been staggering and would likely still be ongoing. The filing dates and primaries have already been postponed once; therefore, in an effort to avoid further delay and mindful of the time considerations which fully incorporating § 2 into our proceeding would have produced, the court decided against conducting a full § 2 inquiry.

### c. *Insufficient legislative history*

Given the foregoing discussion of the differences between § 2 and § 5, as well as the particular considerations presented by this case, the lack of legislative or judicial guidance persuades the court that this is not the case in which to create a blanket rule that § 2 guidelines should be infused into § 5. As noted above, the case law supporting such an interpretation of the Voting Rights Act is scant and is not analogous to this case. *See supra* notes 42–43. Admittedly, the Justice Department has incorporated the substantive standard of § 2 into their § 5 review procedures 28 C.F.R. § 51.55(b)(2). Nevertheless, not only is the Justice Department conducting a review of a specifically proposed plan, but the Justice Department is entitled to more latitude with respect to speculation over the effect of a proposed plan than a federal court.

Finally, in light of all of the foregoing, we are not persuaded that in amending the provisions of § 2 in 1982 that Congress had the intent of amending the standard to be applied in § 5 actions. The proponents of such an incorporation cite to footnote 31 of the Senate Report at 12 U.S. Code Cong. & Admin.News 1982, at 188, fn. 31 which states that "[i]n light of the amendment to § 2, it is intended that a § 5 objection also follow if a new voting procedure itself so discriminates as to violate section 2." While this may be true, it does not necessarily speak to the standard the court is to

apply to the § 5 objection. More to the point, in the vast consideration of both § 2 and § 5 during the amendments to § 2 in 1982, had Congress intended to change the well-known standard applied to § 5 in *Beer,* it would not relegate such an important decision to a single footnote.[44]

### 2. *The Standard of Analysis*

In shaping our application of § 2 to § 5, we are guided by the admonition in *Gingles* that a determination of "whether the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and present reality.'" *Gingles,* 478 U.S. at 45, 106 S.Ct. at 2764 (citations omitted). In addition, since it would be anomalous for this court to adopt a plan which immediately lends itself to an attack under § 2, our analysis should ensure that the threshold requirements of a § 2 action cannot be established under the adopted plan. In this regard, we are guided by the decision in *Jeffers v. Clinton,* 730 F.Supp. 196, 205 (E.D.Ark.1989), *aff'd,* —— U.S. ——, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991):

> We agree that *Thornburg* and *Smith* [*v. Clinton,* 687 F.Supp. 1310 (E.D.Ark. 1988)] cannot be automatically applied to the single-member context. Dilution may be much more obvious in a case like *Smith,* where a potential majority of black voters was submerged in a two-member district. But the basic principle is the same. If lines are drawn that limit the number of majority-black single-member districts, and reasonably compact and contiguous majority-black districts could have been drawn, and if racial cohesiveness in voting is so great that, as a practical matter, black voters' preferences for black candidates are frustrated by this system of apportionment, the outlines of a section 2 theory are made out.

Therefore, with the goal of providing minorities with an equal opportunity to elect the representatives of their choice in

---

does not consider the situation presented in this case. *Getting Results* at 149 n. 75.

**44.** Brief for the *Amicus Curiae,* Katherine I. Butler, December 9, 1991 at 6. *But see Getting Results,* supra note 40. Although the author of this note makes a plausible argument for inter-

preting the legislative history of the Voting Rights Act to incorporate the substantive standard of section 2 into section 5, as mentioned previously, the argument overlooks the unique circumstances presented by this case.

mind, we have analyzed the proposed plans as well as the plans we adopt today based on the following factors: 1) the extent to which the plans proposed and the plans adopted are consistent with the retrogression standard set forth in *Beer* and *City of Lockhart;* 2) the extent to which reasonable compact and contiguous majority black districts were and could be drawn; 3) the extent to which the minority group is politically cohesive; 4) the extent to which racially polarized voting patterns exist; 5) the extent to which the lines which have been drawn limit the number of majority-black single-member districts in light of the expressed state policies of the State of South Carolina. The Senate factors may be applied to the extent that they aid the court in its determination of these factors. This approach allows the court to formulate a plan which is consistent not only with the provisions of § 5, but insures that the court's plan will not violate the threshold requirements for liability under § 2.

### 3. *Defining the Parameters*

Having set forth the extent to which the court has applied § 2 requirements to this case, we return to the four terms which we set forth at the outset as important concepts in our analysis.

#### a. *The definition of majority*

Webster's has two alternative definitions for majority. One definition is "the excess of such a greater number over the remainder of the total," while the other definition is "the group or party whose votes preponderates." Webster's Third New International Dictionary 1363. The two definitions highlight the different interpretations of majority in the context of the Voting Rights Act. While one definition speaks purely in terms of number, the other definition speaks in terms of votes and, by inference, political power. As a result, courts have attempted to reconcile the pure numerical sense of majority with the concept

of an equal opportunity to elect the representative of one's choice. Typically, the reconciliation of these two definitions has occurred in the decision of the court to use either voting age population or total population as the measure of opportunity within a given district. *See McDaniel v. Mehfoud,* 708 F.Supp. 754, 756 (E.D.Va.1989). The distinction is obviously important because defining majority sets the benchmark by which effective political opportunity is measured.

In this case, the court has looked to the voting age population as the measure of the opportunity to elect the candidate of one's choice. In this regard, we are guided by the Fourth Circuit Court of Appeals decision in *McGhee,* 860 F.2d 110, in which the court held that a 51.8 percent black voting age population was sufficient to establish a remedy for a § 2 violation. *Mehfoud,* 708 F.Supp. at 756. The *McGhee* court relied heavily throughout its opinion on the Seventh Circuit's opinion in *McNeil v. Springfield Park District,* 851 F.2d 937, 944–45 (7th Cir.1988) (emphasis in original) in which Judge Cudahy wrote that "[i]n explaining its requirement, the *Gingles* Court consistently refers to 'minority voters,' for only *voters* can demonstrate the potential to elect candidates of their choice." Although the Ninth Circuit has held that total population may be an adequate measure, *Garza v. County of Los Angeles,* 918 F.2d 763, 774–76 (9th Cir. 1990), the implication in *McGhee* that voting age population is the correct measure, as well as the holding in *Mehfoud,* leads us to conclude that political opportunity is best measured in terms of minority voting age population. Thus, a district may be considered a black opportunity district if the percentage of the black voting age population is greater than 50 percent.

Another issue which falls within the concept of majority is the alleged "65 percent rule." The origins of the "65 percent rule" are somewhat unclear; [45] never-

---

45. The concept was first recognized in *United Jewish Organization of Williamsburgh, Inc. v. Carey,* 430 U.S. 144, 164, 97 S.Ct. 996, 1009, 51 L.Ed.2d 229 (1977); yet, there is no indication

that the Court intended to give this guideline talismanic significance. Indeed, the Senate Report on the 1982 Amendments to the Voting Rights Act notes that the number 65 originated

theless, the principle for which the rule stands is that to create an effective majority-minority district, the court should ideally create a district with a 65 percent majority-minority population as a remedy for a § 2 violation. The 65 percent is achieved by adjusting the bare 50 percent majority of total population by 5 percent for young population, 5 percent for low voter registration and 5 percent for low voter turn-out among minorities. *Ketchum v. Byrne,* 740 F.2d 1398, 1415 (7th Cir.1984).

■ The "65 percent rule" has been increasingly rejected as a bright line remedy. *See e.g., Neal v. Coleburn,* 689 F.Supp. 1426, 1438 (E.D.Va.1988).[46] As the court noted in *Coleburn,* "the 65% standard is a flexible and practical guideline to consider in fashioning relief for a § 2 violation." *Id.* First, as opposed to *Coleburn* in which total population figures were used as a baseline, *Id.* at 1437, our use of voting age population as the measure for effective opportunity obviates the need to consider a 65 percent figure as an absolute measure of effective political opportunity. *Ketchum,* 740 F.2d at 1413.

Second, beyond the use of voting age population, we have considered other factors, such as the presence of an incumbent in a district, in formulating our plans. With regard to the presence of an incumbent in a district, the undisputed testimony was that the lack of, or presence of, an incumbent in a district has an effect on voter turnout and this effect is more pronounced for black voters as opposed to white voters. For example, in a district in which there is a black incumbent running, the black voter turnout will be greater than if there is no incumbent running, which will, in turn be greater than if a white incumbent were running. Transcript of Dr. Loewen p. 44–47. This measure then obviously has some impact on the effectiveness of the black voting age population and we have taken this into account in our analysis of the plans.

■ The final issue with respect to defining majority is the importance of "influence districts." Simply put, influence districts are those districts in which the minority population is sizeable but insufficient to comprise a majority of the voting age population. *See Congressional Redistricting* at 223. In *Gingles,* the Court specifically declined to rule on whether courts were obligated to consider "a claim brought by a minority group, that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of multi-member districts impairs its ability *to influence* elections." 478 U.S. at 46 n. 12, 106 S.Ct. at 2764 n. 12 (emphasis in the original). This case does not present the opportunity to decide this issue. Therefore, we have not considered the extent to which influence districts have been or could have been created.[47]

---

from a phone call to an unknown staffer at the Justice Department. Senate Report at 121 n. 40.

46. *See also Congressional Redistricting* at 236–43.

47. The peculiarly political dilemma faced by courts regarding influence districts was illustrated at trial by the opposing views of Nelson Rivers, President of the South Carolina Chapter of the NAACP, and Robert Sheheen, Speaker of the House of Representatives.

Mr. Rivers eschewed the concept of an influence district in favor of maximizing the number of majority-minority, or "opportunity" districts which could be created. Mr. Rivers defined "opportunity district" as "having an equal opportunity to elect a candidate of choice of the black community," Rivers' Transcript at 26, which during his visits with the local chapters of the NAACP came down to the same question "am I in a district that has an opportunity to elect a black person or am I not?" *Id.* at 49.

Regarding influence districts and how the SRAC plan was developed, Mr. Rivers stated:

We didn't have much respect for influence districts. We thought that was a misnomer, really, a kind of phantom that does not yield real political influence or build political power in the state.... [A] good many people had become disabused of the notion that influence really meant much ... It's much more important to have power, obviously, than influence, and so we tried to make sure that we did everything we could to enhance the opportunity to have power.

Rivers' Transcript at 26, 28 (February 20, 1992).

Alternatively, the potential danger of this approach was explained by Speaker Sheheen. In essence, Speaker Sheheen's point was that the creation of majority-minority districts will decrease the number of black voters in the surrounding districts. As a result, though black voters may be guaranteed that their interests will be represented in that one district, their

b. *The definitions of compactness and community of interest*

■ Since the *Gingles* opinion was written, there has been considerable discussion on the definition of compactness and its role as a threshold requirement for liability under § 2. Karlan, *Maps and Misreadings.* In the context of this case, our decision has been guided by the holding of the court in *Dillard v. Baldwin County Bd. of Education,* 686 F.Supp. 1459 (M.D.Ala. 1988) in which the court held that:

> By compactness, *Thornburg* does not mean that a district must meet, or attempt to achieve, some aesthetic absolute, such as symmetry or attractiveness. An aesthetic norm, by itself, would be not only unrelated to the legal and social issues presented under § 2, it would be an unworkable concept, resulting in arbitrary and capricious results, because it offers no guidance as to when it is met ... The degree of geographical symmetry or attractiveness is therefore a desirable consideration for districting, but only to the extent it aids or facilitates the political process, and only as one among many considerations a court should include, the principal one being § 2's vote dilution prohibition, in determining whether there is sufficient compactness for a majority black district.

The court therefore believes, especially in light of § 2's strong national mandate, that a district is sufficiently geographically compact if it allows for effective representation. For example, a district would not be sufficiently compact if it was so spread out that there was no

sense of community, that is, if its members and its representative could not effectively and efficiently stay in touch with each other; or if it was so convoluted that there was no sense of community, that is, if its members and its representative could not easily tell who actually lived within the district. Also of importance, of course, is the compactness of the neighboring districts; obviously, if because of the configuration of a district, its neighboring districts so lacked compactness that they could not be effectively represented, the *Thornburg* standard of compactness would not be met.

*Id.* at 1465–66.

This functional view of compactness in light of effective representation is a sound approach to the problems of compactness, especially with the ability of modern technology to create maps which, though they have maximized percentages by pinpointing specific voters, may resemble a series of ink blot tests. Further, this approach allows the court to consider the different communities of interest which may be involved. For example, considerations for a legislative body such as the South Carolina House of Representatives, which has 124 seats, will be different from the considerations for the Congressional districts which are only six in number. The critical aspect of the approach of the court in *Dillard* is that its flexibility is bounded by the degree to which the elected representative can effectively represent the district. The district created must be "manageable" from the standpoint of constituent services. *See id.*

---

ability to influence the political acts of the legislators in the remaining districts is lessened. Political segregation occurs because the interests of black constituents are packed into several "guaranteed" seats which, though putatively occupied by minority members, do not form a majority of the legislative whole. As Judge Hill noted in *Solomon,* 899 F.2d at 1038:

> In a democracy, elected office holders tend to advance the interests of their electorate. They have no *political* motivation or pressure to represent other members of the population within their state, district, county or etc. The office holder's official fate is in the hands of those who vote and they can—and historically do—demand responsiveness.

*Solomon,* 899 F.2d at 1038; *See also Jeffers v. Clinton,* 756 F.Supp. 1195, 1207 (E.D.Ark.1990) (Eisele, J., dissenting) (emphasis in original); *but see* Karlan, *Maps and Misreadings* at 213.

Thus, without the necessity of building coalitions within the legislative body and among the electorate of a given district, the concern arises that the creation of majority-minority districts as a means of political power serves only to galvanize the separatist barriers that the Voting Rights was designed to attack. Though we certainly do not decide this inherently political issue, we note with apprehension that the Voting Rights Act may be interpreted to promote political apartheid.

Similarly, our definition of community of interest is also guided by the language in *Dillard.* At various points of the trial, it was suggested, if not directly stated, that the color of one's skin alone creates a sufficient community of interest. While we do not intend to minimize the important historic and cultural differences which exist between blacks and whites, the color of one's skin, in and of itself, does not create a community of interest.[48] Rather, a community's views on crime, employment, education, police brutality, urban sprawl, or urban blight may be just as indicative of a community of interest as whether the members of the community are predominantly black or white or the geometric boundaries of the geographical area. Thus, a community of interest may reflect all of these factors and will vary depending on the legislative body under consideration.

## C. *Political cohesion and racial bloc voting*

As the Court recognized in *Gingles,* 478 U.S. at 52 n. 18, 106 S.Ct. at 2767 n. 18, political cohesion and racial bloc voting are essentially interchangeable concepts. It stated, "[t]he purpose of inquiring into the existence of racially polarized voting is twofold; to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidate." *Id.* at 56, 106 S.Ct. at 2769. The Court held that " 'racial polarization' exists where there is a consistent relationship between [the] race of the voter and the way in which the voter votes." *Id.* at 53 n. 21, 106 S.Ct. at 2768 n. 21.

The Court elaborated on this relationship by stating that "[t]he degree of racial bloc voting that is cognizable as an element of a § 2 dilution claim will vary according to a variety of factual circumstances." *Id.* at 58, 106 S.Ct. at 2770. Included in this list of factors are the presence of incumbents, lack of opposition, the nature of the allegedly dilutive electoral mechanism, the percentage of registered voters ·in the district who are members of the minority group as well as the size of the district. *Id.* at 57–58, 106 S.Ct. at 2769–70. Finally, the *Gingles* Court held that the cause of the correlation in the voting patterns is immaterial. *Id.* at 62, 106 S.Ct. at 2772.

As a measure of racial polarization, the Court accepted the use of extreme case analysis and bivariate ecological regression to determine if blacks and whites differed in their voting patterns. *Id.* at 53, 106 S.Ct. at 2767. In this case, both Dr. Arrington and Dr. Loewen used the statistical methods set forth in *Gingles.* Dr. Loewen analyzed election results prior to 1984 and Dr. Arrington analyzed elections primarily from 1984 to the present. Despite the testimony of these witnesses that racially polarized voting exists, the extent to which voting is polarized in South Carolina remains an open question and will certainly vary from locality to locality. *See NAACP v. South Carolina Democratic Party et al.,* No. 88–2492 (D.S.C. filed February 22, 1989), *aff'd,* 898 F.2d 146 (4th Cir.1990).[49] For example, the testimony regarding the strength of polarization exhibited in some races, such as the 1990 governor's race, was minimized by factors such as incumbency. Nevertheless, since we are not determining liability under § 2 in this case, the parties' stipulation that since 1984

---

**48.** *See Edmonson v. Leesville Concrete Co., Inc.,* —— U.S. ——, 111 S.Ct. 2077, 2088, 114 L.Ed.2d 660 (1991). In recognizing that preemptory strikes based on race violate the equal protection clause, the Court in *Edmonson* remarked that "[i]f our society is to continue to progress as a multiracial democracy, it must recognize that the automatic invocation of race stereotypes retards the progress and causes continued hurt and injury. By the dispassionate analysis which is its special distinction, the law dispels fears and preconceptions respecting racial attitudes." Although the context is different, we find the analogy applicable to the assumption that the color of one's skin alone creates a community of interest.

**49.** Plaintiffs' and the Governor's experts repeatedly asserted, with respect to certain areas of the state, that voter polarization had increased since 1982, when § 2 was amended. We note with concern that if this is the case, § 2 appears to not be working in the manner intended.

there is evidence of racially polarized voting in South Carolina is sufficient for our analysis of the plans.

In conclusion, by establishing the framework set forth above, we have attempted to avoid the pitfall noted by Judge Tjoflat in *Solomon* that "amended section 2 'means all things to all parties [and therefore] means nothing at all.'" *Solomon*, 899 F.2d at 1035 (citations omitted). The limitations set forth above represent a practical application of § 2 by providing meaning to the concept of "equal opportunity to elect the representatives of one's choice" in this § 5 proceeding. Having completed this analysis, we consider the individual plans.

## IV

## THE PLANS

As stated earlier, the court has adopted its own plan for each legislative body. The plans are discussed in the order that evidence was taken at trial. Therefore, the Senate is discussed first, followed by the House of Representatives plan and the Congressional plan. The relevant maps and geography reports are attached hereto as exhibits and are incorporated herein by reference. The Senate exhibits are Appendix A; * the House exhibits are Appendix B; and the Congressional exhibits are Appendix C. The population summaries are the first exhibits associated with each set of plans, followed by geography reports, statewide maps, and local maps by county or municipality.

## A

### Senate Plan [50]

#### 1. *Background*

In 1895 the people of South Carolina decided their Senate should be composed of "one member from each County,[51] to be elected for the term of four years by the qualified electors in each County, in the same manner in which members of the House of Representatives are elected." S.C. Const. Art. III, § 6. This section was cogently drafted to accomplish two distinct objectives: 1) to set the numerical composition of the Senate as equivalent to the number of counties [52] and 2) to apportion the members on the basis of one senator from each county. *State v. West*, 249 S.C. 243, 246, 153 S.E.2d 892, 893 (1967). The second of these objectives has been nullified for conflict with federal law. *See Reynolds*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).[53]

The numerical composition section of Article III, § 6, survived *Reynolds* but nearly did not survive the Senate itself. The composition was at issue in *O'Shields v. McNair*, 254 F.Supp. 708 (D.S.C.1966),[54] which involved an attempt by the General Assembly, and more particularly the Senate, to reapportion, using either a Senate/House compromise plan which provided for 50 senators or the Senate's original

---

* Editor's Note—Appendices not supplied for publication.

**50.** The present Senate plan has a deviation of 63.15 percent, which all parties agree is unacceptable.

**51.** In contrast to the explicit provision for 124 members of the House Representatives, no number appears in the Constitution with regard to the Senate, chiefly because the 1895 Constitution contemplated changes in the number of counties. S.C. Const. Art. III, § 3; S.C. Const. Art. III, § 6; S.C. Const. Art. VII, § 1; S.C. Const. Art. VII, § 2.

**52.** S.C. Const. Article VIII, § 3, provides "[n]o more than forty-six counties shall exist at any time, but the General Assembly may provide for

a lesser number." At the time the provision was drawn, South Carolina consisted of 36 counties. S.C. Const. Art. III, § 3.

**53.** The Equal Protection Clause has been interpreted to require that the seats in both houses of a bicameral state legislature must be apportioned on a basis of population. *Reynolds*, 377 U.S. at 568, 84 S.Ct. at 1385.

**54.** The *O'Shields* court declared, after a hearing on December 3, 1965, that the present apportionment of the South Carolina Senate, although in strict compliance with the state constitution, could not be squared with federal constitutional requirements in the post *Reynolds* era. Rather than fashion its own plan, the court gave the General Assembly an opportunity to reapportion itself.

plan which provided for 59 senators;[55] this despite there being 46 counties in the State in 1966. The three-judge court in *O'Shields* concluded the question of numerical composition was more properly resolved by the state courts, but only after opining in *obiter dicta:*

> [a]fter we held on December 3, 1965 that § 6 of Article III, in its application, was invalid under federal constitutional standards because of the great discrepancies in the populations of the counties, the question arises as to what is left of the provisions of § 6 of Article III. Because the federal constitution requires a reapportionment of South Carolina's Senate, is the General Assembly now free to disregard the heretofore unquestionable, if implicit, provision of the state constitution fixing the size of the Assembly? May the General Assembly now, on its own authority, enlarge the Senate from 46 to 50? To 59? To 75?

*Id.* at 711.

The South Carolina Supreme Court emphatically answered the questions posed above by holding "Article III, § 6, remains as an effective and valid part of the Constitution of this State for the purpose of determining the size of the Senate." *State v. West*, 249 S.C. at 247, 153 S.E.2d at 894. Thus, the constitutionally infirm section, which apportioned the Senate, was effectively severed from the section which prescribed the numerical composition. Since there are presently forty-six counties in South Carolina, S.C.Code Ann. §§ 4–3–10 through 4–3–530 (1976), there will be forty-six senatorial districts in the court's plan.

### 2. The Court's Plan

■ Given a total state population of 3,486,703, the "ideal"[56] senatorial district would have a population of 75,798. The largest district in the court's plan,[57] District 21, has a population of 76,516 for a positive deviation of .95 percent (718 persons), and the smallest, District 16, has a population of 75,040 for a negative deviation of −1.00 percent (758 persons). We conclude a total deviation range of 1.95 percent (1476 persons), for the South Carolina Senate, is *de minimis* under the prevailing case law. *Chapman*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975); *Connor v. Finch*, 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977); *Cf. White v. Register*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) (9.9 percent total deviation in Texas state House districts); *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) (7.83 percent total deviation in Connecticut state House districts); *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973) (16.4 percent total deviation in Virginia state House districts).

■ In addition, we conclude the plans proposed by the Governor (0.0106 percent) and the Republican Party (0.0145 percent) have *de minimis* deviations as well. We must, therefore, provide rationale, using either the federal factor of retrogression or significant and traditional state policies, to explain our rejection of these plans and preference for our own.[58] *Chapman*, 420 U.S. at 25–26, 95 S.Ct. at 765–66.

---

**55.** The Senate passed a plan which provided itself with 59 seats and the House passed a plan which provided the Senate with 46 seats. A conference committee compromised on a plan which called for 50 seats with the Senate's original 59 seat plan tacked on as the first alternative. The compromise plan was passed February 3, 1966, and suit was filed February 14, 1966.

**56.** *See* Wollock, ed., *Reapportionment Law and Technology* 6 (1980).

**57.** *See* Appendix A–1.

**58.** While the majority of our discussion will focus on the plans submitted by the Governor and the Republican Party, we note the same analysis can be applied to the plan proposed by the SRAC. That plan proposed a deviation 2.74 percent, which in the opinion of this Court, is pushing the outer limits of the *de minimis* standard. In addition, the same maladies that afflict the Governor's plan and Republican Party's plan, i.e. splitting county lines, splitting precinct lines, afflict the SRAC plan. As for S. 1003 and the Lt. Governor's plan, we conclude the deviations proposed are outside the *de minimis* standard that the court must satisfy and the parties did not convincingly justify this departure at trial.

■ As stated earlier, a non-exhaustive list of state policies, which have historically served to justify *de minimis* deviations and can also serve to distinguish among three constitutionally acceptable plans, includes protection of county or political subdivision lines, compactness, contiguity, recognition of historical boundaries, and protection of constituent-representative relations. *Connor v. Finch*, 431 U.S. at 419, 97 S.Ct. at 1836; *Meier*, 420 U.S. at 23, 95 S.Ct. at 764. *See also Karcher*, 462 U.S. at 740, 103 S.Ct. at 2663; *Swann v. Adams*, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967); *Anne Arundel County Republican Central Committee v. State Administrative Board of Elections*, 781 F.Supp. 394 (D.Md.1991).

The only cognizable state policy the court considered was the preservation of county lines as discussed *supra* pages 1340 to 1341. There are, for our purposes, two types of county line cuts: those which are necessary to meet population requirements and those which are not, which we define as "excess" cuts. An example of the former can be found in the court's plan for Pickens County. This County is entitled to 1.2 senate districts.[59] Thus, the County cannot remain whole. Approximately 18,000 people in Pickens County must be placed in a district laying in large part outside of the county. An example of an unnecessary cut can be found in the Republican Party's plan for Spartanburg County. Spartanburg has a population of 226,780 and is therefore ideally suited for three senate districts. All districts could be drawn intracounty thus avoiding altogether any county line cuts. By comparison, the Republican Party splits Spartanburg County into four senate districts, thereby creating a cut in the county line. For purposes of evaluating compliance with this state policy, we calculated the actual number of districts proposed in a certain county, then subtracted the minimum number of dis-

tricts which could have been drawn had approximate population equality alone been considered. The excess, or remainder, represents an unnecessary intrusion against a county line. This methodology was used consistently throughout all of the legislative plans considered by the court.

Turning to the specific plans, the Governor's plan has 52 excess county line cuts while the Republican Party's plan has 56. By stark contrast, our plan contains only 30 such cuts. Clearly we serve the state's policy better than the other two plans. As for compactness and contiguity we find our plan serves these policies as well as, if not better, than the Governor's plan or the Republican Party's plan and we find our plan protects the state's established communities of interest better than the Governor or the Republican Party.

For a particularly egregious example of the Governor's and the Republican Party's disregard for county lines and communities of interest, we look to their District 10. This proposed district stretches from Anderson County to Aiken County, nearly one hundred road miles away. Along the way, it cuts into seven counties to garner black voters, and consolidates three insular and historical communities of interest; all to create, ostensibly, a majority black district. It seems inconsequential to the proposing parties that the urbanites of Anderson County would be grouped with the rural communities of Abbeville County or that the pulpwood farmers of McCormick County would share representation with the industrial workers of Aiken County. The only cognizable community of interest in this proposed district is the black race. And while there was testimony at trial that blackness alone constitutes a community of interest sufficient to justify a district as contorted as this one, we categorically reject this assertion as overtly racist.[60]

---

**59.** Pickens County has a population of 93,894, which divided by the ideal senate district of 75,798 equals 1.2.

**60.** In *Carstens*, 543 F.Supp. at 91, the court defined a community of interest as "distinctive units which share common concerns with re-

spect to *one or more* identifiable features such as geography, demography, ethnicity, culture, socio-economic status, or trade." (emphasis added). While this definition is helpful, we believe a community of interest is broader than race alone or economic status alone; rather it is

On a related matter, the court's plan splits only 49 precinct lines, while the Governor's plan splits 122 and the Republican Party's plan splits 144. We note that while primarily an issue which effects administrative convenience, splitting precincts also has the effect of confusing both voters and potential voters; thus, in some instances, serving to abridge the right to vote or to have their vote counted. *Cf. Reynolds*, 377 U.S. at 555, 84 S.Ct. at 1378.

Although protecting constituent-representative relations may be a legitimate concern for a legislative body fashioning a plan, *Burns v. Richardson*, 384 U.S. 73, 89 n. 16, 86 S.Ct. 1286, 1295 n. 16, 16 L.Ed.2d 376 (1966), this court must act circumspectly and without taint of arbitrariness. *Connor v. Finch*, 431 U.S. at 415, 97 S.Ct. at 1834. We were therefore concerned with the apparent partisan considerations in certain plans.[61] In sum, there is nothing in either the Governor's plan or the Republican Party's plan to suggest even a casual observance of South Carolina's traditional and legitimate policies.

 In addition to the preeminent goal of "substantial population equality," the court must also take care that its plan has neither the purpose nor effect of denying or abridging the right to vote on the basis of race. *See McDaniel*, 452 U.S. at 148–49, 101 S.Ct. at 2235–36. To assess this, the Supreme Court employs a "retrogression" test. *See supra* pages 1345–1348. As stated earlier, this court viewed

retrogression with respect to the plans as a whole and only secondarily to the retrogressive effects on a district by district basis.

Between 1980 and 1990 black population in South Carolina increased in real numbers from 948,623 to 1,039,884 but decreased in the percentage it constitutes of the total population from 30.38 percent to 29.82 percent. More pertinent, the 10 majority black districts, provided under the 1984 plan, lost a cumulative population total of 92,744.[62] Losing population is a phenomenon which affects districts other than those which are majority black[63] and we specifically find the demographic changes in South Carolina's majority black districts are wholly unrelated to the representation provided; rather the changes are indicative of a general movement away from urban and rural areas to suburban and resort areas.

That we understand why the natural changes occur does not make the task of avoiding a diminution in black voting strength any easier. Many of the majority black districts in South Carolina are contiguous and this makes enhancement problematic, unless one forgoes all other considerations.

The court's plan, despite the demographic changes, creates one additional majority black district, enhances several existing ones, and when considered as a whole clearly "d[oes] not increase the degree of

---

an amalgamation of sometimes amorphous qualities best understood when considered on a backdrop of time. *See supra* note 48 and accompanying text.

**61.** For example, the Governor's plan pits ten incumbent Democratic senators against one another. We also note that at trial several parties chided the Senate for proposing an "incumbent protection plan." Since 1984, when the Senate last drew a plan for itself, only 14 out of 46 senators remain. It seems safe to conclude that the means by which incumbents have sought to protect themselves have been historically ineffective.

**62.**

| Dist. | Population Deviation From Mean (75,798) in real numbers. |
|---|---|
| 7 | − 13,490 |
| 19 | + 5,519 |

| Dist. | Population Deviation From Mean (75,798) in real numbers. |
|---|---|
| 21 | − 13,561 |
| 30 | − 13,297 |
| 32 | − 12,174 |
| 36 | − 8,952 |
| 39 | − 9,451 |
| 40 | − 9,595 |
| 42 | − 18,471 |
| 45 | + 728 |
| | − 92,744 |

**63.** For perspective, from 1987 to 1988, over 40 million Americans, or 17.6 percent of the total population, moved households. U.S. Dept. of Commerce, Bureau of Census, Statistical Abstract of the United States, p. 19, Table 25 (111th ed. 1991). Over a third of those moved to a different county. *See Freeman v. Pitts*, ─── U.S. ───, ───, 112 S.Ct. 1430, ───, 118 L.Ed.2d 108 (1992).

discrimination against blacks" [64] in this State. Therefore, our plan is not retrogressive. *See Appendix* A–1.

 The court's plan contains 10 districts with voting age populations greater than 50 percent as compared to the 1984 plan which had 7 such districts and has 9 districts using the 1990 census figures. Using total population, the court's plan creates 11 majority black districts, including a new District 17 which was heretofore not an equal opportunity district for black candidates.[65] As evidenced by the chart below, the court's plan enhances the other majority black districts where demography and practicability allow. We note again that a district by district enhancement is not constitutionally mandated.

| Dist. | Court's Plan 1990 data | | 1984 Plan | | | | Changes in [66] 1992 Plan | |
| | %Black | %VAP | 1980 data | | 1990 data | | | |
| | | | %Black | %VAP | %Black | %VAP | %Black | %VAP |
|---|---|---|---|---|---|---|---|---|
| 7 | 51.90 | 47.74 | 50.23 | 45.31 | 52.35 | 48.15 | −0.45 | −0.41 |
| 17 | 55.25 | 51.62 | —— | —— | —— | —— | —— | —— |
| 19 | 68.51 | 64.73 | 58.75 | 54.48 | 56.47 | 53.90 | 9.76 | 10.25 |
| 21 | 54.37 | 50.01 | 50.83 | 48.04 | 54.30 | 50.86 | 0.07 | −0.85 |
| 30 | 61.02 | 56.73 | 59.30 | 55.51 | 58.34 | 54.61 | 1.72 | 1.22 |
| 32 | 62.49 | 57.81 | 58.15 | 53.90 | 59.85 | 55.15 | 2.64 | 2.66 |
| 36 | 63.67 | 59.92 | 63.24 | 59.15 | 62.51 | 58.61 | 0.43 | 0.77 |
| 39 | 59.97 | 55.66 | 59.18 | 55.25 | 60.39 | 56.51 | −0.42 | −0.85 |
| 40 | 54.02 | 51.49 | 50.69 | 48.20 | 54.06 | 51.90 | −0.04 | −0.41 |
| 42 | 59.60 | 54.43 | 59.13 | 53.54 | 63.28 | 57.02 | −3.68 | −2.59 |
| 45 | 58.91 | 54.95 | 54.60 | 50.53 | 55.02 | 50.88 | 3.89 | 4.07 |

Of particular interest to the court was District 7, in Greenville County. District 7 elected a black, Senator Theo Mitchell, in 1984 with a total black population ("TOP") of 50.23 percent and a BVAP of 45.31 percent. Senator Mitchell has served continuously since 1984. District 7 decreased in population by 13,490 or 17.80 percent of the district from 1980 to 1990. In addition, this district is completely surrounded by majority white districts, making enhancement difficult.[67] Consequently both the TOP and BVAP percentages are lower in our plan than the 1984 plan using 1990 figures; nevertheless, the minority population of this District still has a fair chance to elect the candidate of their choice. In fact, Senator Mitchell himself supported S. 1003, which provided District 7 with TOP of 50.95 percent and a BVAP of 46.84 percent, clearly less than what the court has provided.

Drawing Districts 39 and 40 proved especially problematic for the court. As the court's map shows, District 40, which lost 9,595 people, is contiguous with District 39, which lost 9,451. Under the 1984 plan using 1990 figures, District 39 had a robust TOP of 60.39 percent and BVAP of 56.51 percent. Considering its loss of population, however, District 39 needed black population added in a proportion relatively equal to that under the 1984 plan using 1990 numbers to avoid a decrease in percentage numbers and to meet the *de minimis* stan-

**64.** *City of Lockhart v. United States,* 460 U.S. at 134, 103 S.Ct. at 1004.

**65.** This new district has a total black population of 55.25 percent and a black voting age population of 51.62 percent. Since it was alleged by all parties that there is no incumbent running in the area of District 17, we conclude a 51.62 percent black voting age population clearly represents an opportunity for the black majority to elect the candidate of their choice.

**66.** To calculate the percent increase in black total population (TOP) and voting age population (BVAP), we took whichever was higher between the 1980 figure and the 1990 figure.

**67.** Only one plan submitted (Governor's plan) provided a higher TOP or BVAP for this district than our plan and not only was the enhancement minimal it was achieved only by splitting numerous precincts. This Court concludes the perils of splitting precincts, in this instance, outweighed the slight enhancement proposed.

dard. Unfortunately, District 40, which under the 1984 plan using 1990 numbers had a TOP of 54.06 percent and a BVAP of 51.90 percent and is represented by a white, obviously had little black population to provide. So, the court, given the significant limitations caused by natural retrogression coupled with the geographics of the region, equalized the unavoidable decreases in Districts 39 and 40 rather than sacrifice one to avoid any decrease at all in the other.[68] Therefore, the court's plan strikes the proper balance between the various interests arising in this type of proceeding, including equality of population in districts, racial fairness, and maintenance of the South Carolina's political subdivisions and communities of interest.

## B

### House of Representatives

■ The South Carolina House of Representatives is composed of 124 single-member districts. S.C. Const., Art. III, § 3. Representatives serve two-year terms. S.C. Const., Art. III, § 2. The last redistricting of the House occurred incident to the 1980 census. Those districts were enacted into law in 1981 and precleared by the United States Justice Department. This districting scheme has never been successfully challenged under § 2 of the Voting Rights Act.

As stipulated by the parties, the current House districts are constitutionally deficient because of disparities in population among the districts. According to the 1990 census, the ideal House district should contain a total population of 28,118.57 persons. The total deviation from this norm under the 1981 House plan is 113.86 percent. District 106 in Horry County, a resort area, has 76.76 percent more population than an ideal district using 1990 census data. Dis-

trict 109, in Charleston County, has 37.09 percent less population than an ideal district. An examination of the 1981 plan districts using 1990 data shows generally that there have been strong population gains in suburban and resort areas of the state and declining populations in inner-city and rural areas of the state.

In effectuating the constitutional state policy of preserving county boundaries to the extent possible given federal constitutional and statutory requirements, the 1981 plan made 17 "excess" cuts in county lines. *See* text, supra, p. 1360 for discussion of an "excess" cut. Twenty-nine total districts extended across county lines, with 20 districts falling within two counties, seven falling within three counties, and two falling within four counties.

As noted earlier, *supra,* note 34, the 1981 plan, as originally drawn, contained 26 districts where blacks constituted a majority of the total population in that district and 20 districts with a majority black voting age population. At present, using 1990 census data, the number of such seats has declined to 24 total population majority districts but increased to 21 majority black voting age districts due to natural retrogression.[69]

The plan now implemented by the court as an interim remedy addresses the constitutional infirmities of the old plan while giving due deference to established state policies, particularly the state constitutional policy of preserving the integrity of county boundaries. *Weiser,* 412 U.S. at 795, 93 S.Ct. at 2354. Given the substantial population deficits in the more rural areas of the state and population surpluses in the suburban and resort areas of the state, close adherence to the old district boundaries, the last explicit expression of

---

**68.** All plans but the SRAC plan proposed decreases in BVAP percent in District 39 when compared with 1984 plan using 1990 numbers, while three of the five plans proposed in BVAP percent in District 40 using the same data. Again, the Governor and the Republican Party split numerous precincts to achieve their respective marginal enhancements.

**69.** One district, 93, lost a majority black voting age population. Two districts, 59 and 122, gained voting age population between 51–52 percent, but were 12.09 percent and 4.38 percent short of population, respectively. One district, 109, went from a 48.55 percent black voting age population to 65.16 percent but was 37.09 percent short of population from the ideal district. *See supra* note 34.

state policy with respect to the districting of the House, is not feasible or necessarily possible. *Cf. Upham v. Seamon,* 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982) (permitting adjustments to boundaries only to the extent necessary to remedy violation); *Riley,* 533 F.Supp. at 1181 (same).

The court's plan has a total deviation of 1.98 percent. District 14, covering southern Laurens County and northern Abbeville and Greenwood Counties, is .99 percent short of ideal population, or 279 persons. District 123, comprised chiefly of the Hilton Head area of Beaufort County, is .99 percent over ideal population, or 279 persons. This deviation is legally *de minimis;* therefore, the constitutional requirement of one man, one vote implicit in the Fourteenth Amendment is satisfied. *Chapman,* 420 U.S. at 22, 26–27, 95 S.Ct. at 763, 765–66; *see supra,* pages 1342 to 1345.

■ The court's plan is not retrogressive. Twenty-three of the districts in the court's plan contain a black voting-age population majority as opposed to the 1981 plan at present (21) or when drawn (20).[70] This represents a two district increase over the 1981 plan as it presently exists or a three district increase over the 1981 plan as originally enacted by the General Assembly and approved by the Justice Department. The court's plan also contains a total of 28 districts with black total population majorities. Because "the position of racial minorities with respect to their effective exercise of the electoral franchise" under the court's plan is enhanced over the position with respect to the previous plan, the court's plan satisfies § 5's retrogression standard. *Beer,* 425 U.S. at 142, 96 S.Ct. at 1364; *see supra,* pages 1345 to 1348.

■ To the extent possible, the court's plan also attempts to honor the express state policy of preserving county boundaries in the creation of election districts. The court's plan contains 20 "excess" cuts in county boundaries. *See supra,* pages 1340 to 1341. Of the 124 districts in the court's plan, 38 lie in two or more counties as follows: 29 (two counties); 7 (three counties); 2 (four counties). These figures reflect only a slight increase over the figures presented in the 1981 plan.

Of the plans submitted to the court for consideration, the plans of SRAC, the Republican Party, House Speaker Sheheen's Revised 2, and the Governor also contained *de minimis* total population variations among the districts.[71] Each of these plans created a larger number of black majority districts than the plan now adopted by the court.[72] Each plan throws all consideration of the state policy of recognizing county lines to the wind, however. Each plan, with the exception of Speaker Sheheen's plan, however, also seeks the imprimatur of the court upon the elimination of house incumbents to suit the sponsoring party's political purpose, i.e. the Republican Party and the Governor appear to seek to eliminate Democrats and the SRAC appears to seek to eliminate incumbents because of their race.

As to county lines, each of the four proposed plans make the following "excess" cuts in county lines: Republican Party (40); Governor (38); Sheheen (37); and SRAC (48). The number of districts lying in two or more counties in each of the plans is as follows:

---

**70.** When military populations are subtracted from the following districts the BVAP increases as follows in certain districts: District 70—64.01 percent; District 109—55.57 percent; and District 122—54.38 percent. This would create an additional district with a BVAP above 50 percent for a total of twenty-four districts.

**71.** SRAC—1.952 percent; Republican Party 0.18 percent; Governor 0.98 percent; Sheheen 1.998

percent. The House-passed plan had a deviation of almost 10 percent and was not, therefore, considered by the court as an acceptable alternative for implementation by the court.

**72.** SRAC—32 (TOP), 32 (BVAP); Republican Party—36 (TOP), 33 (BVAP); Governor—35 (TOP), 33 (BVAP); Sheheen—29 (TOP), 21 (BVAP).

| | Republican | Governor | SRAC | Sheheen |
|---|---|---|---|---|
| Two Counties | 28 | 33 | 34 | 36 |
| Three Counties | 16 | 12 | 9 | 10 |
| Four Counties | 1 | 1 | 6 | 2 |
| Five Counties | 1 | 1 | 3 | 1 |
| Total | 46 | 48 | 52 | 49 |

As to incumbency, three plans pit the following numbers of incumbents against one another:

(a) Republican Party—six sets of Democrats (two individuals are allegedly retiring); 1 set of Republicans; and 2 sets of mixed Republican and Democratic incumbents.

(b) Governor—eight sets of Democrats (two individuals are allegedly retiring); 1 set of Republicans; and 2 sets of mixed Republican and Democratic incumbents.

(c) SRAC—19 sets of white incumbent representatives and one set with one black and one white incumbent, including eight pairs of Democrats, five pairs of Republicans, and 7 mixed political pairs (one incumbent is not running and two are allegedly retiring).

Each of these plans has an acceptable total deviation; all three contain a deviation below that found in the court's plan and Speaker Sheheen's plan is only slightly higher. None of the plans retrogress under § 5 standards. Unlike the parties, however, this court is not free to impose a particular political or racial agenda upon the state.[73] The court must, as a court of equity, remedy the constitutional deficiencies of the current plan with due deference to express state policies. The court's plan, we believe, achieves the proper balance between drawing districts of equal population, recognizing concentrations of black voters, and giving effect to current state policy respecting the redistricting process and avoiding the "political thicket" that arises in pitting large numbers of incumbents against one another.

As discussed in part III above, § 2 of the Voting Rights Act looks to the effects or intent of a specific plan. Where, as here, there have been no elections under the court's plan, assessment of the "results" of such plan is speculative. We have, however, consistent with the guidelines set forth in Part III, reviewed the court's plan and conclude that it contains no obvious violations of § 2. The districts drawn by the court recognize those concentrations of black population in the state that are sufficiently large and geographically compact to form a majority in a single member district. In so drawing districts, the court was cognizant that there is no duty to maximize the number of black majority districts in the state or insure proportional representation on the basis of race. 42 U.S.C. § 1973.

The court concludes that the balance struck in its plan is the appropriate balance. While other plans create a larger number of black districts, they do so without regard to any interest but race and without the clear necessity which justifies a § 2 remedy. A brief discussion of some aspects of the other plans proposing a greater number of black majority districts illustrates this point.

The House plan proposed by the Republican Party, containing 36 majority black districts using total population, represents an attempt to achieve proportional representation on the basis of race, a result specifically not dictated by any federal or state law.[74] *See* 42 U.S.C. § 1973 ("nothing in

---

**73.** *See supra* p. 1361. In the ten years since the House was last redistricted, the people have only retained approximately 31 of 124 representatives who sat in House when the 1981 plan was adopted. Over half of the current representatives were elected to the House after 1984. As noted at trial, the defendant Robert Sheheen, Speaker of the House and a 15–year veteran of the House, only narrowly won reelection in 1990.

**74.** Thirty-six of the 124 seats in the House represents 29.03 percent of the House membership.

this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population"). Thus, the Republican plan draws lines without regard to any factor except skin color and possibly political affiliation. As previously noted, the Republican plan shows little regard for traditional state political units such as the county. The plan also divides numerous smaller municipalities and towns into separate districts.

Proposed District 55 in the Republican plan is illustrative. The town of Cheraw, in Chesterfield County, one of that county's largest towns, is divided and part of the town is placed in District 55 which chiefly lies in northern Marlboro County across the Great Pee Dee River. The southern boundary line of the district also divides the town of Bennettsville, the county seat of Marlboro County, placing part of the town in District 55 and another part in proposed District 54. At its eastern end, approximately 50 road miles from Cheraw at the western end, District 55 embraces a piece of the town of Dillon, the county seat of Dillon County, the third county contained within the district. Despite all the slicing and splicing of towns and counties, the district created by the Republican plan only has a total black population of 52.98 percent and a black voting age population of 50.74 percent, numbers barely sufficient to characterize the district as a majority minority district. The Republican district, composed of fractions of three counties and three towns, has no demonstrated cohesiveness. There is no evidence showing that political ties exist between the communities incorporated in the district. Each elects its own councils and school boards.

The Governor's plan, with 35 districts, suffers from the same defect.[75] Though not as egregious in its splintering and splicing tendencies in the Marlboro County area, the Governor's proposed District 54 also divides the towns of Cheraw and Ben-

nettsville and spans parts of two counties, Chesterfield and Marlboro, yet only achieves a district with a 52.22 percent total black population and 49.89 percent black voting age population.

Finally, the plan presented by the SRAC, containing 32 proposed majority minority districts, does not attempt, to the degree of the other plans, to create proportional representation. Nonetheless, the plan suffers some of the same infirmities as the other plans.

Proposed District 105 in the SRAC plan lies wholly within Horry County. With no apparent purpose other than capturing as many black persons in Horry County as possible within a closed area, the district starts near the northwestern corner of the county and runs in a thin, snaking line back and forth across the county, ending at the southern end of the county. The proposed district embraces several distinct rural areas of the county, the town of Loris in the northern part of the county, parts of the resort area, particularly around Myrtle Beach and the Myrtle Beach Air Force Base, and parts of the Town of Conway, the county seat. One would be hard pressed to draw a district which more effectively splits communities of interest in a county and raised skin color to the sole criteria for boundary drawing. Geographical compactness and cohesion is particularly important in a House district which is naturally smaller and less diverse than, for example, a congressional district. The lack of reasonable geographic compactness demonstrated by the bizarre shape of the district and the lack of any distinct community of interest, apart from race, which would demonstrate district cohesiveness, indicate to the court that no § 2 violation arises by failing to include such a district in the court's plan.

In summary, given the nature of this proceeding, the evidence, and the law, the

---

29.82 percent of the total population of South Carolina is black.

**75.** The similarity in methodology between the plan of the defendant Governor and the plaintiff Republican Party is hardly surprising. Mark

Elam, a member of the Governor's staff, prepared both plans and testified on behalf of both plans though the parties were, ostensibly, on opposite sides of the case.

court is satisfied that its plan satisfies the requirements of the Voting Rights Act. The court's plan strikes the proper balance between the various interests arising in this type of proceeding, including equality of population in districts, racial fairness, and maintenance of the state's political subdivisions and communities of interest.

## C

### Congressional Plan

■ As mentioned previously, the parties stipulated the current congressional districts are malapportioned if the 1990 census data is applied to the current plan. In keeping with the principle of one man, one vote, a properly apportioned district would have 581,117 individuals. As a result, the deviation of the current plan using 1990 data is 8.33 percent, which is unacceptable. The parties submitted a total of nine plans for the court to consider.[76]

As discussed above, the court developed its plan consistent with the following factors: 1) the extent to which the plans proposed and the plans adopted are consistent with the retrogression standard set forth in *Beer* and *City of Lockhart;* 2) the extent to which reasonably compact and contiguous majority black districts were and could be drawn; 3) the extent to which the minority group is politically cohesive; 4) the extent to which racially polarized voting patterns exist; 5) the extent to which the lines which have been drawn limit the number of majority-black single-member districts in light of the expressed state policies of the State of South Carolina.

Based on these factors, two important considerations emerge. First, to what extent does the court's plan comport with the more stringent equal population requirement required for congressional districts? Second, to what extent does the court's plan draw reasonably compact and contiguous black districts?

■ As stated previously, *Karcher* sets forth a two-pronged inquiry for assessing any variation in districts from a standard of equality: (1) Does a plan represent a good-faith effort to draw districts of equal population,.and (2) Is any "significant" variance between districts necessary to achieve some legitimate state goal? *Karcher,* 462 U.S. at 731, 103 S.Ct. at 2658. The court's plan clearly comports with the stringent equal population requirements set forth in *Karcher.* 462 U.S. at 731, 103 S.Ct. at 2658. As indicated in the table, *see supra,* note 76, with the exception of the Governor's plan, the court's plan is the only plan with a zero deviation. The other plans proffered to the court have deviations ranging from .15 to .36 percent. Since the court has developed a plan which achieves

---

**76.** In addition to the plans set forth below, the SRAC proposed a plan on the next to the last day of the proceedings, the Speaker submitted an additional plan and the Amicus presented a draft of a plan. The SRAC intended to offer a "compromise plan" on behalf of itself, the Senate, and the Lt. Governor; however, Governor Campbell and Congressman Tallon objected to the introduction of this plan on the basis of timeliness and this objection was sustained. The SRAC was permitted to proffer testimony on this plan at the conclusion of the Congressional phase.

Although the Speaker filed a prior plan on behalf of the House, which did not include a majority-minority district, we have focused on the plan subsequently ratified by the House and which was advocated at trial by the Speaker.

As for the plan of the Amicus, although the court has considered the general theories espoused in the plan, detailed geographical data for the plan was not available. Finally, the Republican Party did not present a Congressional plan at trial, but rather adopted the Governor's plan. The salient features of each plan are set forth below:

| Plan | % Deviation | Split Counties | Split VTDs |
|------|-------------|----------------|------------|
| Court | 0 | 13 | 5 |
| Governor | 0 | 17 | 14 |
| House | .13 | 11 | 0 |
| SRAC | .15 | 29 | 0 |
| Tallon | .21 | 7 | 0 |
| Senate | .25 | 25 | 1 |
| Lt. Gov. | .36 | 14 | 1 |

zero percent deviation, we decide neither the extent to which the deviations of the other plans may be considered *de minimis* nor the validity of their justifications for their deviations.

■ The second point we address is the creation of a majority-minority district. Every plan submitted created a black majority district. While the parties disagreed as to the particular shape of such a district, all of the state policymakers—the House, the Senate and the Governor—agreed that such a district should be drawn. *Carstens*, 543 F.Supp. at 79. As a result, the record before the court is devoid of any argument that a majority-minority district should not be created and our decision today is bound by the record developed at trial. Given the lack of an adversarial proceeding in this regard, we do not decide if the court was *required*, under existing legal principles, to create a majority-minority district. Nevertheless, based on the criteria set forth above, the court devised a plan which created a majority-minority district.

First, as stated in *Beer*, "[t]he purpose of § 5 has always been to insure that no voting-procedure changes would be made that would lead to retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Id.* 425 U.S. at 141, 96 S.Ct. at 1364. By establishing a black majority district, the court has enhanced "the position of racial minorities with respect to their effective exercise of the electoral franchise," *Beer*, 425 U.S. at 142, 96 S.Ct. at 1364, and has satisfied the retrogression standard set forth in *Beer*, *Id.*, and *City of Lockhart*, 460 U.S. at 134, 103 S.Ct. at 1004.

Having decided that creating a black majority district would satisfy retrogression considerations, we next looked to the extent to which a reasonably compact and contiguous majority black district could be drawn. The record sets forth the general concentration of black population which

runs in a crescent from South Carolina's southwestern border with Georgia through the midlands to the coast in Georgetown County. *See* Brief of *Amicus Curiae* Katharine I. Butler at 9. This crescent does not follow county lines. *Id.* As a result, any black majority district would have to encompass this area. Further, to achieve an effective opportunity for blacks to elect a candidate of their choice, the district had to include those portions of the Charleston and Columbia metropolitan areas with high concentrations of minority voters. By including the Charleston and Columbia metropolitan areas within the black-majority district, the court was able to create a district which has a 57.9 percent black voting age population.

Though we acknowledge that the resulting districts may stretch the concept of compactness, especially in light of the intrusion into the Charleston and Columbia metropolitan areas, we cannot say that the districts do not comport with the flexible approach to compactness advocated by the court in *Dillard, supra.* First, and foremost, the creation of a majority-minority district itself "aids and facilitates the political process" by assuring compliance with the retrogression standard of *Beer*. *See Dillard*, 686 F.Supp. at 1465. Second, the testimony at trial was sufficient to indicate that the district would be manageable from the standpoint of constituent services.[77] Finally, there is no indication from the record that the impact on the surrounding districts would impair the effective representation of those districts. Thus, in the context of congressional districts, we cannot say that the creation of a majority-minority district would violate the compactness requirement set forth in *Gingles*.

■ As for the existence of racial bloc voting and political cohesion, by encompassing the crescent of black population within the black-majority district, the court's plan accounts for these considerations to the extent they exist. Finally, the

---

77. In this regard, we note the testimony of Ms. Smalls, who is the chief of staff for Congressman Tallon and administers his local offices. Ms. Smalls testified that the black majority district created in Congressman Tallon's plan would be manageable. The court's plan, which is no less compact, would be similarly manageable.

court's plan acknowledges South Carolina's specific state policy of maintaining the integrity of county lines. S.C. Const. Art. VII, § 13; *See supra* pages 1340 to 1341. The plan developed by the court only splits 13 county lines.[78] Though other plans may split fewer counties, these plans do not have as low a deviation as the court's plan. The court only split county lines when it was necessary to achieve a minimum variation or to increase the percentage of black population within the majority-minority district consistent with the non-retrogression principles of *Beer* as set forth above.

Based on the foregoing, the plan created by the court satisfies the important principles of one man, one vote and is consistent with the requirements of the Voting Rights Act. No other plan has a lower deviation and splits fewer counties than the court created plan.

## V

### CONCLUSION

Much has changed in South Carolina since 1984 and even more since 1980. One thing that has not changed is the General Assembly's inability to redistrict without judicial intervention or at least prodding. The General Assembly knew the census was coming, correctly predicted malapportionment, and had both sophisticated software and capable operators in place to draw plans. Nevertheless, no compromise was ever reached with the Governor's office and this court was called upon to perform a task that all concede is most properly a legislative one. As set forth more fully above, the duties of a legislature and a federal court are not the same. While we certainly can consider significant state policies, we have less latitude to serve those policies than a state legislature would enjoy.

Since the General Assembly and the Governor did not fulfill their obligations, and the plans proposed at trial suffered an array of infirmities, reluctant as we were, this court unabashedly fashioned its own plans. Our plans meet the *de minimis* standards of *Chapman*, the deviation standard of *Karcher*, and the retrogression standard of *Beer* as applicable to each plan. In addition the plans protect the traditional and legitimate policies of South Carolina. It is our hope that the General Assembly and the Governor will work together and fashion acceptable plans. In the interim, these are the plans for the South Carolina Senate, House of Representatives and the United States Congressional districts.

IT IS ORDERED, therefore, that the redistricting plans for the South Carolina Senate [Appendix A],** South Carolina House of Representatives [Appendix B], and the South Carolina Congressional delegation [Appendix C] shall be the lawful election districts for each of those bodies for the general elections scheduled in 1992,[79] and for all subsequent elections until redistricting plans for those bodies are lawfully enacted by the South Carolina General Assembly, signed by the Governor, and approved by the United States Department of Justice pursuant to 42 U.S.C. § 1973c.

IT IS FURTHER ORDERED, that the claim of plaintiffs Bufort Blanton, et. al, C.A. No. 3:91–3635–1, regarding the constitutionality of the county delegation system is deconsolidated from this action and referred to a single judge of the district court for resolution. Fed.R.Civ.Proc. 42(b). As to all other claims in the consolidated cases, the interim plans of the court stand as the final judgment of the court as to those claims. We expressly find no just reason for delay; therefore, final judgment shall

---

**78.** As a practical matter, five county cuts were necessary to achieve minimal variance. Any remaining cuts were made to enhance black population within the districts. *See supra* page 1360.

** Editor's Note—Appendices not supplied for publication.

**79.** By order entered March 6, 1992, the court directed that the filing dates for the bodies cov-

ered by our plans would run from June 1–June 25, 1992; primary elections would be held August 25, 1992; run-off primary elections, if necessary, would be held September 8, 1992; and certification of candidates to the election commissioners would occur on September 18, 1992.

be entered with respect to all remaining claims. Fed.R.Civ.Proc. 54(b).

IT IS SO ORDERED.